748 F.2d 238
 35 Empl. Prac. Dec. P 34,796, 21 Ed. Law Rep. 463
 Victoria Cha-Tsu SIU, Appellant,
v.
George W. JOHNSON, individually and as president; Averett
S. Tombes, individually and as Dean of the Graduate School;
David J. King, individually and as Vice President for
Academic Affairs; F. Donald Eckelmann, individually and as
Dean, Appellees.
Virginia Conference of the American Association of
University Professors, Amicus Curiae/A.
 No. 83-1785.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 5, 1984.
Decided Nov. 20, 1984.
 
 Benjamin P. Lamberton, Washington, D.C. (Hugh B. Gordon, Hewes, Morella, Gelband & Lamberton, P.C., Washington, D.C. on brief), for appellant.
 Pamela Sargent, Asst. Atty. Gen., Richmond, Va. (Gerald L. Baliles, Atty. Gen. of Virginia, Richmond, Va., on brief), for appellees.
 Doug Rendleman, Williamsburg, Va., on brief for amicus curiae, The Virginia Conference of the American Association of University Professors.
 Before PHILLIPS and CHAPMAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 Victoria Cha-Tsu Siu (Siu), an assistant professor at George Mason University, a state supported institution of the Commonwealth of Virginia, appeals from the district court's Rule 41(b) dismissal of her action challenging on constitutional grounds the University's failure to promote and grant her tenure. We affirm.
 
 
 2
 * The essential facts, many of which are stipulated, are as follows. Siu, a Catholic nun and an Oriental by national origin, was appointed to an assistant professorship at George Mason for the 1976-1977 academic year, having completed her doctorate at Georgetown University in 1975. Her original one-year appointment to teach East Asian studies in the History Department was later renewed for successive two- and three-year terms, representing the academic years 1977-1979 and 1979-1982, respectively. She remained the University's sole East Asianist throughout this period.
 
 
 3
 By virtue of her appointment to a tenure track position, Siu was eligible to be considered for tenure and promotion in her sixth year of employment.[1] As established by University policy, candidates being considered for tenure were to be evaluated in accordance with substantive standards embodied in the University's Faculty Handbook:[2]
 
 
 4
 These standards, in turn, were to be used in determining whether the candidate had achieved the general level of accomplishment required to justify promotion in rank. The Faculty Handbook defines this level for associate professorship, the position to which Dr. Siu aspired, as follows:
 
 
 5
 Associate Professor. An associate professor must have demonstrated beyond question his fulfillment of the various criteria established as a measure of the superior teacher. In addition, he must have demonstrated his capacity and concern for research and scholarship in ways appropriate to his discipline (see Chapter II, Section D). Finally, his record of service must provide assurance of a continued and significant contribution to the life of his department and of the University.
 
 
 6
 As implied by these standards, the substantive criteria for evaluating faculty for promotion and tenure are divisible into three major categories: teaching performance, research and scholarship, and University service.[3]
 
 
 7
 The Handbook also details the procedures whereby tenure decisions are to be made. First, the candidate is evaluated by the faculty of his or her department in accord with the stated substantive criteria. The department chairman then transmits the departmental faculty's recommendation, along with his own, to the advisory committee on promotions and tenure of the relevant University college and its dean. The advisory committee then notifies all members of the candidate's department and invites their comment, after which it reviews any evidence submitted by any member of the academic community, including the candidate. The collegial dean and the Vice President for Academic Affairs review the committee recommendations and other materials and then make a recommendation to the President. Ultimately, the President renders a decision regarding his support or non-support of the candidate's nomination. If tenure is recommended, the Board of Visitors, which alone has authority to grant tenure, then acts on the affirmative recommendation. The President does not communicate negative decisions to the Board of Visitors, but if one is made, the candidate may seek further review before a faculty hearing committee, at the conclusion of which the President may reconsider his initial negative decision.
 
 
 8
 The various faculty review boards that considered Siu's candidacy made favorable recommendations. The Department of History's Reappointment, Promotion and Tenure Committee voted 8-3 to recommend tenure and promotion,[4] as indicated by a letter of its chairman to Professor Harsh, the History Department Chairman. Harsh, in turn, also recommended promotion and tenure. The Advisory Committee on Promotions and Tenure of the College of Arts and Sciences (CAS) concurred in Harsh's recommendation by vote of 4-2.
 
 
 9
 At higher administrative levels, however, Siu's candidacy met with opposition, all of which centered around her deficiency in scholarship and publication. Defendant Averett Tombes, serving in his first year as Graduate Dean, addressed a memorandum to the Vice President for Academic Affairs recommending against Siu's candidacy because "the clear lack of strong and consistent scholarship" failed "to support the position that Dr. Siu would be a contributing scholar after she is promoted to the next level." Tombes's deposition testimony indicated that, instead of deferring to the faculty committee's evaluation of Siu's qualifications, he made a "clean slate," and assertedly more objective, judgment. Admittedly, however, Tombes made his decision not upon the full dossier compiled during the departmental reviews, but upon the abbreviated confidential file submitted to the CAS. Tombes read only a portion of Siu's published works. Defendant Eckelmann, serving in his first year as CAS Dean, wrote President Johnson recommending against tenure, noting "the modest level of research productivity and the prospect that this will not change in the future."
 
 
 10
 Following his own review, President Johnson advised Siu that he could not support her tenure candidacy after having looked at the various deans' recommendations and after having considered the general qualifications of that year's other candidates. He did not recall examining Siu's dossier before rendering decision. While Johnson advised participating faculty members of his decision, he cited no specific "compelling reasons"[5] for declining to follow their recommendation.
 
 
 11
 Next, Johnson asked David S. King, Vice President for Academic Affairs, to review Johnson's negative decision. King evaluated Siu's candidacy in the three essential areas of teaching, University service, and scholarship, concluding that Siu's scholarship was clearly deficient. In his judgment, as expressed in a letter to Johnson, the documentation in Siu's departmental record failed to establish excellence in teaching; data evaluating her performance in relation to that of other faculty by objective standards was lacking. Coupled with the unimpressive record of her scholarship, King concluded that negative factors outweighed positive in the three critical areas. In response to this letter, Johnson reviewed Siu's file again and concluded that his initial decision was correct. Johnson thereupon notified Siu that tenure would be denied and that the 1982-1983 academic year would be her final year at Mason.
 
 
 12
 Siu responded by bringing suit against the University, Johnson, King, Tombes, Eckelmann, and David Powers, King's predecessor. Her complaint alleged that defendants' decisions to recommend denial of tenure (hence promotion as well) violated the fourteenth amendment's equal protection and due process clauses and constituted acts of discrimination because of race and national origin in violation of 42 U.S.C. Secs. 1981 and 1983. Siu sought declaratory and injunctive relief as well as damages. By amended complaint, Siu dropped the University as a defendant; she failed to obtain service of process on Powers.
 
 
 13
 Trial was had to the court sitting without a jury. At the close of plaintiff's case-in-chief, which included oral and deposition testimony, the district court granted defendants' motion for dismissal under Fed.R.Civ.P. 41(b). Judgment was entered accordingly and this appeal followed.
 
 II
 
 14
 We first briefly address Siu's claim--obviously pressed as a secondary one--that the decision to deny her promotion and tenure was motivated by constitutionally impermissible considerations of her religion and her national origin. This claim, pressed rather ambiguously under the equal protection clause and 42 U.S.C. Sec. 1981, required for its establishment that Siu prove by a preponderance of the evidence that the defendants purposefully discriminated against her on these grounds. See Washington v. Davis, 426 U.S. 229, 239-45, 96 S.Ct. 2040, 2047-50, 48 L.Ed.2d 597 (1976).
 
 
 15
 The district court, acting under Fed.R.Civ.P. 41(b), dismissed this claim on the basis of a general finding that the requisite discriminatory motive had not been proved.[6] We review that finding of ultimate motivational fact under the clearly erroneous standard of Fed.R.Civ.P. 52(a), see Pullman-Standard v. Swint, 456 U.S. 273, 285-90, 102 S.Ct. 1781, 1788-91, 72 L.Ed.2d 66 (1982), and on that basis readily conclude that it cannot be held clearly erroneous.
 
 
 16
 Whether assessed under the special proof scheme developed for circumstantial proof of disparate treatment in Title VII litigation, see, e.g., Banerjee v. Board of Trustees of Smith College, 495 F.Supp. 1148, 1156 (D.Mass.1980), aff'd 648 F.2d 61 (1st Cir.1981) (Title VII proof scheme adaptable to constitutional claim under 42 U.S.C. Sec. 1981), or under ordinary principles for the assessment of conflicting evidence of motivation, see Lovelace v. Sherwin-Williams Co., 681 F.2d 230 (4th Cir.1982), the evidence amply supported the district court's determination that discriminatory purpose had not been proved.
 
 
 17
 Siu points to evidence from which a discriminatory motive might arguably have been inferred; but it is all so remotely circumstantial that the leap of inference required to find purposeful discrimination on its basis might well not have been one rationally supportable.[7] See Lovelace, 681 F.2d at 239. Even if the favorable inference was supportable, however, there was also more than ample evidence to support a finding that the reason advanced by the defendants--doubt about Siu's overall academic performance and potential--was the true and only reason for the decision, whether or not it was a wise and informed one. We therefore affirm the district court's dismissal of the claim of unconstitutional discrimination because of religion or national origin.
 
 III
 
 18
 Siu's principal claim both in the district court and on this appeal is that she was denied procedural due process: that the defendants' negative tenure decision was state action taken under color of law that deprived her of property without due process of law, in violation of rights secured by 42 U.S.C. Sec. 1983.[8] We conclude that the district court did not err in also dismissing this claim.
 
 
 19
 There is, first off, the question of whether Siu's contractual employment status as a classic probationary academic employee "on the tenure track" but untenured, gave rise to a property interest for which any procedural protection was constitutionally due. See Baker v. McCollan, 443 U.S. 137, 146-47, 99 S.Ct. 2689, 2695-96, 61 L.Ed.2d 433 (1979) (threshold question under Sec. 1983 is whether constitutionally protected interest exists). Rather surprisingly perhaps, this precise question has not been directly addressed by this court, though we have earlier considered various claims of substantive constitutional violations in connection with denials of academic tenure or promotion.[9]
 
 
 20
 Given the nature of the classic tenure-track probationary appointment,[10] there is a real question whether in that classic form it gives rise to a constitutionally protected property interest that survives normal expiration of its term. Arguably, it is in that form essentially employment at will, in the sense that no cause need be established for the academic employer's declining upon expiration of the probationary term to convert the former relationship into permanent, "tenured" employment. Such an appointment might well be viewed as creating in its holder no more than a unilateral expectation that in regular course the relationship might ripen, following expiration of the probationary term, into permanent employment, terminable thereafter only for cause. Such a merely unilateral expectation, even though grounded in a particular institution's customary practices that make it in practical terms a reasonable one, might nevertheless be thought not to amount to a constitutionally protectible property interest. Certainly, it is arguable that in the absence of special institutional circumstances it does not create the sort of clear, nondiscretionary "entitlement" to renewed employment that the Supreme Court has suggested is required to establish a constitutionally protected property interest in academic employment. See Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) ("property interest [requires] more than a unilateral expectation of it; ... [requires] instead, ... a legitimate claim of entitlement to it"].
 
 
 21
 On this basis, some courts have treated the probationary tenure track appointment as if it were indeed no more than employment at will, and have held that it does not therefore give rise to a protectible property interest beyond its stated term. See, e.g., Megill v. Board of Regents, 541 F.2d 1073, 1077 (5th Cir.1976) (so far as federal due process is concerned, state could deny tenure for any reason except constitutionally impermissible one; hence no property interest). On the other hand, some courts have intimated--even after Roth --that the "expectancy" might be elevated to constitutionally protectible property interest status by contractually binding provisions which, in some form or another, require a regularized decisional process for declining to award tenure. See, e.g., Skehan v. Board of Trustees of Bloomsburg State College, 590 F.2d 470 (3d Cir.1978); Mabey v. Reagan, 537 F.2d 1036 (9th Cir.1976).
 
 
 22
 Siu predictably relies upon these latter decisions as authority for the proposition that here too the University's stated procedures for making the tenure decision had the effect of creating a constitutionally protectible property interest in her. We doubt that these decisions directly support Siu's position,[11] and question whether, in any event, under Roth the property interest claimed by Siu would exist unless the University's procedures and their application over time had given rise to an institutional "common law of re-employment" under which the interest created by her probationary appointment had been elevated to something firmer than a mere "unilateral expectation." See Roth, 408 U.S. at 578 n. 16, 92 S.Ct. at 2710 n. 16. The district court did not address that possibility, and for that reason the factual record may not be adequately developed to permit us to address it were we disposed to do so in the first instance. That is not, however, necessary to our decision. We can instead assume, for purposes of this appeal only, that the contractual procedures as customarily applied may have created a protectible property interest, and proceed to consider whether any process conceivably due for its "deprivation" was, in any event, afforded Siu.
 
 
 23
 The first question under that due process inquiry, assuming the interest here was constitutionally protectible, is the nature of the process due. On this point Siu seems, though ambiguously, to press as her main position that the process due was no less than that defined in detail by the institutional procedures. We have long since rejected that position with respect to other claims of deprivation of both property and liberty interests for whose protection detailed state procedures have been provided, see, e.g., Bowens v. North Carolina Department of Human Resources, 710 F.2d 1015, 1019 (4th Cir.1983); Detweiler v. Commonwealth of Virginia Department of Rehabilitative Services, 705 F.2d 557, 561 (4th Cir.1983), and we see no reason for treating academic employment differently.
 
 
 24
 Where a property interest--including one involving academic employment--is claimed to be derived from state law sources, see Roth, 408 U.S. at 577, 92 S.Ct. at 2709, it is obviously necessary to look to those sources to determine the general nature of the interest, for the process constitutionally due is dependent upon that. See Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); see also Board of Curators of the University of Missouri v. Horowitz, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) (academic dismissal of student). And in making that inquiry the procedures provided in those sources for creating and terminating the interest are obviously relevant to the extent they help define the general nature of the interest. But that is the limit of their relevance to the constitutional inquiry. They do not define in detail the process constitutionally due for protection of the interest, except to the extent that they may coincide with elements of that process as independently defined by federal law. See Detweiler, 705 F.2d at 561.
 
 
 25
 The special relevance of the procedures to this limited inquiry is their indication of the general nature of the decisional process by which it is contemplated that the "interest" may be terminated. In particular, the procedures will likely indicate whether the decisional process is intended to be essentially an objective one designed to find facts establishing fault, or cause, or justification or the like, or instead to be essentially a subjective, evaluative one committed by the sources to the professional judgment of persons presumed to possess special competence in making the evaluation. See Parham v. J.R., 442 U.S. 584, 608, 99 S.Ct. 2493, 2507, 61 L.Ed.2d 101 (1978).
 
 
 26
 When that inquiry is made here the nature of such property interest as exists is plainly revealed in these terms. The procedures prescribed for making the tenure decision--including the decision not to award tenure, thereby "terminating" whatever interest may have existed--plainly contemplate a subjective, evaluative decisional process by academic professionals rather than an objective fact-finding process by tribunals adapted to that quite different purpose. This in turn indicates that any process constitutionally due the subject of that decision is not in essence an adversarial fact-finding procedure for which fairly stringent judicial review to insure adequacy is both necessary and possible, but is one much more subjective and less susceptible, therefore, to fine-tuned judicial review. See Clark v. Whiting, 607 F.2d 634, 643-45 (4th Cir.1979) (contrasting process arguably due for academic [evaluative] and disciplinary [fact-finding] dismissals).
 
 
 27
 Indeed, the process due one subject to this highly subjective evaluative decision can only be the exercise of professional judgment by those empowered to make the final decision in a way not so manifestly arbitrary and capricious that a reviewing court could confidently say of it that it did not in the end involve the exercise of professional judgment. Cf. Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (though state mental institution inmate has retained liberty interest in freedom from undue physical restraint, due process not violated if restraint imposed in exercise of professional medical judgment). This in turn means that insuring the adequacy of the process as followed in a particular case does not require or permit a court to inquire into the ultimate wisdom, or prudence, or informed nature of the decision finally made. The judicial inquiry is properly only whether the decision was made, wisely or not, by a specific exercise of professional judgment and on the basis of factors clearly bearing upon the appropriateness of conferring academic tenure. Cf. Youngberg, 457 U.S. at 321, 102 S.Ct. at 2461 (comparable standard for judicial inquiry into exercise of professional judgment in deprivation of liberty interest).
 
 
 28
 Before applying these general principles to the case at hand, we pause to consider the principal contention by Siu respecting the process due and denied her. The contention is that because University procedures assign to peer faculty elements the primary responsibility for evaluating the professional qualifications of tenure candidates, due process requires that "administrators" up the reviewing line defer to those peer faculty evaluations. On this view, reviewing authorities could not, without violating procedural due process, deny tenure except for other compelling institutional reasons where, as here, peer faculty evaluations are favorable. We cannot accept this contention, even were we to accept its premise that the prescribed procedures do indeed have this intended effect as a matter of contractual obligation.[12]
 
 
 29
 Peer faculty primacy in this respect may obviously be a matter of rightful and great concern to faculties. Both in the governance of particular institutions and in the general protection of essential academic freedom in our society at large, such a safeguard may rightly be thought by responsible members of the professoriat to be vital. Required deference to "working" faculty judgments in evaluating the professional qualifications of their peers may therefore be a proper subject for vigorous faculty associational efforts,[13] for negotiated contractual ordering, or for voluntary conferral by sufficiently enlightened and secure academic institutions. But we are not prepared to hold that it is an essential element of constitutionally guaranteed due process, whether or not it is contractually ordered or otherwise observed as a matter of custom in a particular institution.
 
 IV
 
 30
 Applying these principles here, we conclude that the district court did not err in rejecting Siu's claim of due process denial. As indicated, Siu's challenge is essentially confined to the defendants' failure to defer completely to the (majority) judgments of faculty peer groups that Siu should be awarded tenure (and promotion). As also indicated, even if it be assumed that the institutional tenure procedures indeed required such deference as a matter of express or implied contract--a matter not at all free of doubt--we have held that this would not constitute a denial of constitutionally guaranteed due process.
 
 
 31
 In all other respects it is clear that--whether or not it was a wise or provident one--the tenure decision was made by defendants on the basis of factors clearly relevant to legitimate institutional interests in awarding tenure. Not only did the evidence fail to prove the consideration of constitutionally impermissible factors, neither was there any suggestion that personal malice, or reckless inattention to relevant materials, or comparable wholly nonprofessional factors may have made the decision an arguably arbitrary and capricious one. Indeed, it is obvious that the decision was rested directly on the perceived, relative lack of scholarly potential, a factor central to a responsible decision respecting tenure conferral. This satisfied the demands of procedural due process guaranteed by the fourteenth amendment for the protection of any property interest that existed in Siu's expectancy of employment beyond her probationary term.
 
 
 32
 AFFIRMED.
 
 
 33
 Tenure consideration during the sixth year of employment was the typical, though not exclusive, practice of the University. Mason also had a procedure whereby tenure review could occur as early as the applicant's second year.
 
 
 
 [2]
 The Faculty Handbook was published by the University to provide guidance, as the name suggests, to members of the faculty. Not all of the Handbook has been formally adopted by the Board of Visitors or its designate. The standards relating to tenure, however, have been formally adopted and therefore are presumably incorporated as an aspect of faculty members' contractual employment. The standards are stated, in fine detail, as follows:
 
 
 [1]
 Know one's subject matter and be abreast of current developments
 
 
 [2]
 Make classroom presentations that reflect originality and scholarship
 
 
 [3]
 Support and maintain high academic standards;
 
 
 [4]
 Continue to evaluate one's teaching methods and strive to improve them;
 
 
 [5]
 Be effective in oral and written communication;
 
 
 [6]
 Recognize students as individuals and respect the contributions of students;
 
 
 [7]
 Be enthusiastic about one's subject and provide intellectual stimulation to his or her students;
 
 
 [8]
 Possess a scholarly attitude, a capacity for independent thought, and a continuing interest in research;
 
 
 [9]
 Make the results of one's scholarship available to others through publication and other avenues as appropriate
 
 
 [10]
 Provide sound academic advice to students and make other contributions to student life;
 
 
 [11]
 Be readily available to students and other members of the academic community;
 
 
 [12]
 Participate actively in the life of the department, bringing to this work scholarship, enthusiasm and a cooperative spirit;
 
 
 [13]
 Willingly and diligently serve on college and University committees and perform other necessary duties as appropriate;
 
 
 [14]
 Be active in learned and professional societies and achieve recognition as a scholar outside the local academic community;
 
 
 [15]
 Play an essential role in the academic program of the University;
 
 
 [16]
 Make appropriate scholarly and professional contributions to the local community and to society at large
 
 
 [3]
 The requirements for Associate Professorship also occurs in a formally-adopted section of the Handbook
 
 
 [4]
 All of the committee members of rank higher than Siu's voted in favor of her candidacy
 
 
 [5]
 The section of the Handbook describing the role of the faculty in the faculty evaluation process, a section not adopted by the Board, provides:
 Personnel Decisions. As detailed elsewhere, the faculty is primarily responsible for recommendations involving appointments, reappointments, and dismissal. The faculty also exercises a strong voice in the appointment and evaluation of department chairmen and other academic administrative officers. Although the faculty plays a primary role in the matters mentioned above, the power of final decision is lodged in the Board of Visitors or delegated by it to the President. However, when, for compelling reasons, the President cannot follow a faculty recommendation in these matters, the reasons will be communicated to the faculty group which made the recommendation.
 
 
 [6]
 Siu attacks the generality of the finding, but it was adequate sufficiently to indicate its basis, which was simply that discrimination on religious or national origin grounds had not been proven
 
 
 [7]
 The evidence in the end came only to the fact that Siu was indeed a Catholic nun and an Oriental by national origin; arguably, that she had been singled out for particularly onerous academic duties and that other faculty members no better qualified than she had been treated more favorably in the challenged respects. There was no direct evidence of racial or religious animus directed specifically at her or at others in religious or ethnic minorities
 
 
 [8]
 This claim was also the one principally pressed by the Virginia Conference of the American Association of University Professors which, by leave, filed an amicus brief in support of Siu's appeal
 
 
 [9]
 See, e.g., Mayberry v. Dees, 663 F.2d 502 (4th Cir.1981) (claim of first amendment violation in denying promotion); Smith v. University of North Carolina, 632 F.2d 316 (4th Cir.1980) (claim of constitutional and statutory discrimination on basis of gender, age, and religion in denying promotion, tenure, or reappointment); Clark v. Whiting, 607 F.2d 634 (4th Cir.1979) (claimed violation of equal protection and due process in denying promotion)
 
 
 [10]
 The nature of the classic probationary tenure track appointment has been well described and analyzed by Judge Murnaghan in a related legal context in Mayberry v. Dees, 663 F.2d at 512-19
 
 
 [11]
 In both Skehan and Mabey, the property interests found to exist by virtue of the probationary employment were only found protected against terminations, or nonrenewals, for prescribed causes: asserted violation of academic freedom (Skehan ); reduction in force (Mabey ). It is of course generally accepted that to the extent a non-tenured faculty member enjoys contractual (or customary) protection during a probationary or fixed term appointment against terminations except for cause (or for forbidden cause), she has a protectible property interest, an entitlement, in continued employment for the term except upon a due process determination of cause. Skehan and Mabey seem actually only to apply that principle in variant forms
 Siu's claim by contrast is of a property interest in reemployment itself following expiration of the probationary term, though, in possible deference to Roth, she couches the claim in terms of its being a "property interest in the procedures." Put this way the claim is a circular one: the state's detailed procedures provide the due process guarantees which create the very property interest protected by those guarantees. This is conceptually unacceptable. Its logical effect would be to "constitutionalize" all state contractual provisions respecting the continuation of public employment.
 
 
 [12]
 That this is the intended effect of the institutional documents prescribing tenure decision standards and procedures is by no means sure. Aside from the fact that the governing board of the University has not formally adopted the critical portion of the Faculty Handbook that in terms makes "the faculty ... primarily responsible for recommendations involving ... the granting of tenure," see note 5 supra, it is arguable that the documents plainly contemplate that academic administrators (themselves presumably present or former "faculty" members) may reject peer faculty recommendations on professional qualification grounds as well as on other grounds related to institutional interests
 
 
 [13]
 This is indeed the interest directly asserted by the associational amicus in this case