820 F.2d 1224
 43 Empl. Prac. Dec. P 37,167
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Gerald R. Bergman, Ph.D., Plaintiff-Appellant
v.
Bowling Green State University et al, Defendant-Appellee.
 Docket No. 86-3031.
 United States Court of Appeals, Sixth Circuit
 June 16, 1987.
 
 Before Jones, Ryan and Norris, Circuit Judges.
 PER CURIAM:
 
 
 1
 Plaintiff, Dr. Gerald Bergman, appeals the judgment for defendants in this action brought pursuant to 42 U.S.C. Sec. 1983 (1982) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000(e) et seq. (1982). The basis for this action is plaintiff's claim that he was denied tenure without due process and on the basis of his religion. Because the district court's findings of fact are not clearly erroneous and because the law was properly applied, we affirm.
 
 
 2
 The facts found by the district court are as follows. Plaintiff was first hired by Bowling Green State University (BGSU) for the 1973-74 school year in the Department of Educational Foundations and Inquiry (EDFI) of the College of Education. He was initially hired as an assistant professor but was reduced to the rank of instructor later during the school year when he did not receive his Ph.D. as soon as he had expected. Plaintiff received one year temporary contracts for the school years 1974-75 and 1975-76. In January 1976 the EDFI faculty evaluation committee (the departmental group appointed to make recommendations) recommended that he receive a terminal (final) contract for the school year 1976-1977 since he had not yet attained his Ph.D.
 
 
 3
 Plaintiff's contract for the 1976-77 year was changed from terminal to temporary after proof was received that he had completed all the requirements for a Ph.D. degree. His major was in educational evaluation and research. He also received a temporary contract for the year 1977-78. In February 1978, the faculty evaluation committee and the educational psychology area within EDFI recommended against reappointment of the plaintiff for the 1978-79 school year. The Measurement and Research Area within EDFI split 3-3-1 (4 against/abstain) on the reappointment decision. The chair of the department, Dr. Reed, recommended in favor of reappointment.
 
 
 4
 Also in February 1978, plaintiff applied for promotion. The faculty evaluation committee recommended that plaintiff not be promoted to the rank of assistant professor and the chair agreed with that recommendation. The committee cited several inconsistencies in plaintiff's vita submitted for promotion. Plaintiff thereafter appealed to the dean of the College of Education, Dr. Elsass. The dean referred the matter for advice to the Personnel Policies and Professional Growth Council (PPPG). After allowing plaintiff to submit additional materials, the PPPG recommended promotion by a vote of six to three. The dean thereafter recommended promotion "with some reluctance" to the provost, Dr. Ferrari. The provost approved the promotion in October 1978.
 
 
 5
 Upon promotion, plaintiff's status was converted to probationary, and for the first time he was on a tenure track. Since the University's Academic Charter requires that a professor on tenure track be evaluated for tenure during his sixth year, a tenure review was in order for the plaintiff during the winter quarter of 1979. If approved, tenure is awarded after the seventh year. If not approved, the professor must leave after the seventh year.
 
 
 6
 Plaintiff submitted tenure materials on January 20, 1979. On about February 9, 1979, the Measurement and Research Area voted 6-2 in favor of tenure. But on February 14, 1979, the EDFI tenured faculty members met and voted 14-6 against tenure.
 
 
 7
 Tenure on the faculty at Bowling Green State University is a status conditionally available to a probationary faculty member. Assuming the candidate has adhered to professional standards of ethics, tenure is granted or denied on the basis of teaching effectiveness, scholarly or creative work, service to the University and the attainment of the terminal degree or its equivalent. J.App.285. The Academic Charter of Bowling Green State University states that "[a]n affirmative vote of at least two thirds of all tenured members of the department shall be required to recommend that tenure be granted." J.App. 286. The charter's supplement further mandates that "tenure in an academic department shall not be granted without the consent of the department affected." J.App. 294.
 
 
 8
 The chair of the department passed the tenured faculty's negative vote to the dean of the College of Education along with the chair's positive recommendation. The dean then commissioned a PPPG counsel to review the plaintiff's candidacy. The PPPG recommended tenure by a vote of 6-4. On this recommendation, the dean recommended tenure to the provost. The provost reviewed plaintiff's candidacy along with those of many others at a meeting of the counsel of deans. (The counsel of deans is composed of the deans from the various colleges.) At that meeting, it was agreed that the College of Education had utilized an incorrect routing procedure. The deans agreed that BGSU's charter requires a two-thirds vote of the tenured faculty for a positive recommendation to be forwarded. Since plaintiff lacked the two-thirds vote, the matter could not be forwarded, and plaintiff's only recourse after that department's negative vote was to appeal to the Faculty Senate.
 
 
 9
 Plaintiff was notified of this decision and appealed to the Faculty Senate on four grounds. The Faculty Personnel and Conciliation Committee (FPCC), a branch of the Faculty Senate, notified plaintiff on or about June 8, 1979 that his appeal would be handled in accordance with the grievance arbitration procedure and that conciliators had been appointed. Conciliation efforts failed, and plaintiff was notified on or about June 28, 1979, that a five-person hearing board had been scheduled to hear his appeal. Pursuant to the grievance arbitration procedure, plaintiff challenged one of the hearing board members and that person was replaced.
 
 
 10
 The FPCC conducted a hearing on July 17, 1979. Plaintiff was present with a representative of his choice, Dr. Ralph Wolfe. He also had a witness who testified in his behalf, Dr. Charlesworth. The department was represented by Dr. Burke, with Dr. Bernard Rabin as academic advisor. After hearing the evidence the FPCC hearing board ruled 5-0 against plaintiff on all four counts, finding:
 
 
 11
 1. There was evidence that plaintiff received informal information concerning the evaluation of his performance by the tenured faculty of his department and if there was a failure to provide formal written annual evaluations it did not warrant reversal of the judgment of the faculty.
 
 
 12
 2. There was no evidence that plaintiff's academic freedom had been infringed.
 
 
 13
 3. Concerns expressed by faculty peers about the quality of plaintiff's teaching and scholarship were real concerns based on appropriate evidence.
 
 
 14
 4. There was no evidence that plaintiff's religious views or affiliations influenced the overall judgment of the tenured faculty.
 
 
 15
 In noting that unresolved doubts about possible breaches of professional ethics may properly influence a tenure vote, the hearing board concluded that there were appropriate and serious concerns about plaintiff's performance and that opportunities to respond were available to him.
 
 
 16
 The FPCC's findings were in the form of a recommendation to the provost, who had authority to accept or reject it. Plaintiff submitted three memoranda to the provost subsequent to the hearing. The provost reviewed plaintiff's arguments and concluded that there was insufficient evidence and no defensible administrative basis for recommending reversal of the tenured faculty's judgment. Based on the procedures and judgments of the FPCC Hearing Board, the provost recommended to the president of the University that plaintiff be granted a terminal contract for 1979-1980. President Moore adopted this recommendation. Plaintiff's employment with BGSU ceased after the 1979-80 academic year.
 
 
 17
 Plaintiff subsequently filed charges with both the Equal Employment Opportunity Commission and the Ohio Civil Rights Commission. Both agencies, following investigation, determined that there was no probable cause to conclude that the University or its agents discriminated against the plaintiff on the basis of his religious beliefs.
 
 
 18
 Plaintiff filed suit in federal district court on June 24, 1980, alleging that his due process rights had been violated and that he had been denied tenure on the basis of his religious views. He named as defendants Bowling Green State University; Hollis Moore, as president of BGSU; and Dr. Michael Ferrari, individually and as provost of BGSU.
 
 
 19
 On October 25, 1982, Judge Walinski, ruling on the defendants' motion for summary judgment, concluded that Bowling Green State University is an instrumentality of the State of Ohio, and accordingly dismissed it as a party defendant to the 42 U.S.C. Sec. 1983 claim. Dr. Moore, the president of the University when the action was initially filed, had died and Dr. Paul J. Olscamp, the new president, had been substituted. In his ruling on the motion for summary judgment, Judge Walinski found that Dr. Olscamp, sued only in his official capacity as president of the University, was immune from liability for damages. Accordingly, the court dismissed the claims for back pay and punitive damages as to Dr. Olscamp. He was retained as a defendant "for prospective injunctive relief." The court found that there was an issue of fact whether Dr. Ferrari could be held individually liable under Sec. 1983, and so retained him as a defendant.
 
 
 20
 Before trial, the district court also ruled on a motion to compel the disclosure of how the BGSU tenured faculty had voted on plaintiff's tenure application. In denying the motion, the court held that in most circumstances, a plaintiff's right to know the vote would be more compelling than the voters' rights to academic freedom. Nevertheless, the court believed that in this case the actual vote was not relevant to the real issue of the faculty's intent since plaintiff did not allege that the faculty had refused to divulge why they voted as they did:
 
 
 21
 The plaintiff does not claim that he has been refused discovery of the matters considered at the peer review committee meeting. He also does not challenge the deponents' candor on any matter other than the vote itself. If the plaintiff's motion raised one of these other claims, the result might be different.
 
 
 22
 J.App. 94.
 
 
 23
 A bench trial was held for approximately two weeks, beginning on March 12, 1985. The district court's findings of fact and conclusions of law were filed on December 6, 1985. He made the factual finding that the faculty members had based their decision on "concerns regarding [plaintiff's] ethics, teaching, quality of publications and relevance of publications to his teaching area," J.App. 27, and not on inappropriate considerations of plaintiff's religion. He also found that plaintiff had received annual peer and student evaluations as well as informal feedback from colleagues and students. J.App. 29. The court made the legal conclusions that plaintiff had neither been discriminated against nor denied due process.
 
 
 24
 Dr. Bergman, appearing pro se on appeal, challenges both the district court's findings of fact and conclusions of law. We will address first the district court's denial of plaintiff's motion to compel. A district court's decision to deny a discovery request is reversible only for abuse of discretion. See, e.g., Tarleton v. Meharry Medical College, 717 F.2d 1523, 1535 (6th Cir.1983); 8 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2006 at n. 87 (1970). Moreover, a party must show that the denial of discovery has prejudiced him and has not been rendered moot. Id. Sec. 2006.
 
 
 25
 In the case at hand, plaintiff argues that the district court accorded a "privilege" against discovery to the tenure committee's vote that is unwarranted under Gray v. Board of Higher Educ. 692 F.2d 901 (2nd Cir.1982), and Blaubergs v. Board of Regents (In re Dinnan), 661 F.2d 426 (5th Cir. Unit B 1981), cert. denied, 457 U.S. 1106 (1982). However, as the district court itself stated, "the order of the court does not rest on its opinion as to the scope of academic freedom so much as upon a view that the only evidence actually sought here was not relevant to the issue of intent." J.App. at 106. The district court reasoned that knowing only how tenured faculty members had voted would not contribute to the discovery of whether religious discrimination had occurred. Rather, the court thought that plaintiff should have sought the considerations taken into account by the committee. The court implied that if plaintiff sought the reasons for his rejection and was denied such information, then a motion to compel might be granted. The evidence ultimately presented at trial reveals that faculty members were willing to divulge the reasons for their actions and that some even testified how they voted. Indeed, some faculty members told of factors weighing against plaintiff, but at the same time revealed that they had voted for him. Thus, the district court did not abuse its discretion in holding that the votes in and of themselves were not probative of intent.
 
 
 26
 Even if the district court's decision had been based on the protection of the faculty members' academic freedom, such a privilege might have been appropriate in this case. The Second Circuit held in Gray, 692 F.2d at 908, that the university will automatically be required to disclose faculty votes only when no statement of reasons is given for a tenure decision. In the instant case, plaintiff was given the reasons for the faculty's decision. Therefore, the district court would not necessarily have erred in granting a privilege protecting the secrecy of the faculty's vote.
 
 
 27
 Next, we address Dr. Bergman's due process claim. This claim seems to be based on his belief that he has a constitutional right to have the University follow to the letter its stated procedures before denying him tenure. However, plaintiff never demonstrates that, as a probationary employee, he had a property interest in his continuing employment with BGSU. As the Supreme Court noted in Board of Regents v. Roth, 408 U.S. 564 (1972),
 
 
 28
 The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount but the range of interests protected by procedural due process is not infinite.
 
 
 29
 Id. at 569-70 (footnote omitted). The Supreme Court in Roth went on to discuss when a constitutionally protected property interest will be recognized:
 
 
 30
 To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.
 
 
 31
 Id. at 577. Using this analysis, the Supreme Court held in Roth that an assistant professor at Wisconsin State University--Oshkosh who had been hired for only a one-year term was not entitled to a hearing prior to the nonrenewal of his contract.
 
 
 32
 Whether a person has a legitimate expectancy of continued employment depends very much on the facts of each case. However, this circuit has generally declined to hold that a nontenured faculty member has a property interest in his continued employment unless the person was somehow "implicitly" tenured. See, e.g., Soni v. Board of Trustees, 513 F.2d 347 (6th Cir.1975), cert. denied, 426 U.S. 919 (1976). In the context of nontenured grade school teachers, this court held that,
 
 
 33
 A non-tenured teacher may acquire an "expectancy" of continued employment where "the policies and practices of the institution" rise to the level of implied tenure. We hold, however, that a non-tenured teacher has no "expectancy" of continued employment, whatever may be the policies of the institution, where there exists a statutory tenure system.
 
 
 34
 Ryan v. Aurora City Bd. of Educ. 540 F.2d 222, 227 (6th Cir.1976) (citations omitted), cert. denied, 429 U.S. 1041 (1977). More importantly, this court held in Ryan that the Board of Education's self-imposed regulations, which required a statement of reasons for dismissal, did not create a federal right that did not otherwise exist. Id. at 228-29. Thus, the court rejected plaintiffs' contention that "even if they are not entitled to a hearing under the authority of Roth and Sindermann, they at least are entitled to the protections prescribed by the Board's own regulations." Id. at 228. See also Lake Mich. Col. Fed. of Teachers v. Lake Mich. Comm'ty Col., 518 F.2d 1091, 1095 (6th Cir.1975) (claim to public employment does not rise to level of property interest merely because of procedures required when discharging employee), cert. denied, 427 U.S. 904 (1976).
 
 
 35
 Since Dr. Bergman makes no claim that he thought he was impliedly tenured by BGSU, his only possible argument would be that the University's procedures as customarily applied had created a protectible property interest. As discussed supra, this argument appears already to have been rejected in this circuit. However, even if we did find that BGSU's policies created some limited property interest, the district court correctly held that any process constitutionally due to plaintiff was afforded him.
 
 
 36
 Like the plaintiff in the Fourth Circuit case of Siu v. Johnson 748 F.2d 238 (4th Cir.1984), Dr. Bergman presses as his main position that the process due is no less than that defined in detail by the institutional procedures. However, these institutional procedures are not identical to, but only a guideline for, what may be constitutionally required. Id. at 244. As the Fourth Circuit has held,
 
 
 37
 The procedures prescribed for making the tenure decision--including the decision not to award tenure, thereby "terminating" whatever interest may have existed--plainly contemplate a subjective, evaluative decisional process by academic professionals rather than an objective fact-finding process by tribunals adapted to that quite different purpose. This in turn indicates that any process constitutionally due the subject of that decision is not in essence an adversarial fact-finding procedure for which fairly stringent judicial review to insure adequacy is both necessary and possible, but is one much more subjective and less susceptible, therefore, to fine-tuned judicial review.
 
 
 38
 The judicial inquiry is properly only whether the decision was made, wisely or not, by a specific exercise of professional judgment and on the basis of factors clearly bearing upon the appropriateness of conferring academic tenure.
 
 
 39
 Id. at 244-45 (emphasis added).
 
 
 40
 Employing these standards enunciated by the Fourth Circuit, we conclude that plaintiff's complaints that he was not given formal written evaluations and was not given enough notice of his hearing would not state violations of his constitutional due process rights. The district court found that plaintiff was denied tenure because he failed to win the two-thirds vote of his department's tenured faculty, as required by Article XIV of the University's charter and by Supplement A to that charter. The district court further found that the votes against him were based on valid academic concerns. Therefore, plaintiff was not denied due process.
 
 
 41
 We interpret plaintiff's primary argument on appeal to be that the district court was clearly erroneous in finding that the reasons for his tenure denial did not include his religion.
 
 
 42
 A decision by a district court on the issue of discrimination, or lack thereof, under Title VII subject to review under the clearly erroneous Standard of Rule 52(a), Fed.R.Civ.P. Findings of the district court are not clearly erroneous unless, upon review of the entire record, the court is left with a definite and firm conviction that a mistake has been committed.
 
 
 43
 Jackson v. RKO Bottlers of Toledo, Inc. 743 F.2d 370, 374 (6th Cir.1984) (citations omitted), cert. denied, 106 S.Ct. 3798 (1986).
 
 
 44
 In support of his contention that religious discrimination is overwhelmingly present in this case, plaintiff discusses at length in his appellate brief his belief that religious discrimination is rampant in America and the world. This, of course, does not prove that his particular tenure denial was based on such discrimination. Plaintiff also cites at length the comments of people whom he says should have been called as witnesses for the trial of this case. But we, of course, cannot review evidence not presented to the court below. Fed.R.App.P. 10. After winnowing out the irrelevant and the impermissible references in plaintiff's brief, we have determined that the district court's factual findings were not clearly erroneous.
 
 
 45
 The district court found that one concern of the tenured faculty was plaintiff's ethics. For instance, Dr. Davidson testified that plaintiff's misrepresentation of himself was the reason for the denial of tenure. He stated that Dr. Bergman said he was a psychologist when he had no psychological credentials. Dr. Wiersma indicated difficulty in documenting the actual existence of plaintiff's books. Plaintiff argues that any such allegations of misconduct can be disproved by him. Nevertheless, the evidence reveals that the tenured faculty members were genuinely concerned about plaintiff's ethics and that their confusion over his actual qualifications was premised on the difficulty in verifying his vita.
 
 
 46
 The district court also found that the tenure denial was based on concerns regarding the quality and relevance of plaintiff's work. Dr. Siefert, Dr. Yonker, Dr. Davidson, Dr. Rurke, and Dr. Wiersma, for example, all testified to their negative impressions of plaintiff's work. Although plaintiff may believe that their evaluations of his work were incorrect, this does not negate the fact that they based their tenure votes on their negative perceptions of his work.
 
 
 47
 In light of the numerous witnesses who testified to legitimate concerns about plaintiff, and in light of the faculty members' denials that religion played a part in their decisions, we hold that the district court's finding of no religious discrimination is not clearly erroneous.
 
 
 48
 Accordingly, we Affirm the judgment of the district court.