UNITED STATES of America,
Plaintiff–Appellee,

v.

Michael Francis CHARTERS, Jr.,
Defendant–Appellant.

AMERICAN PSYCHOLOGICAL
ASSOCIATION, Amicus Curiae,

v.

AMERICAN PSYCHIATRIC ASSOCIA-
TION, Amicus Curiae.

No. 86–5568.

United States Court of Appeals,
Fourth Circuit.

Argued June 9, 1988.

Decided Dec. 9, 1988.

Thomas Rawles Jones, Jr. (William B. Moffitt, Lisa Bondareff Kemler, Moffitt & Jones, Alexandria, Va., on brief), for defendant-appellant.

Donald B. Verrilli, Jr. (Donald N. Bersoff, Ennis, Friedman & Bersoff, Washington, D.C., on brief), for amicus curiae American Psychological Ass'n in support of defendant-appellant.

Joel I. Klein (Robert D. Luskin, Onek, Klein & Farr, Washington, D.C., on brief), for amicus curiae American Psychiatric Ass'n in support of plaintiff-appellee.

Victor Darrel Louis Stone, U.S. Dept. of Justice, Washington, D.C. (Henry E. Hudson, U.S. Atty., Constance H. Frogale, Asst. U.S. Atty., Alexandria, Va., Melissa Glassman, Third–Year Law Student, on brief), for plaintiff-appellee.

Before WINTER, Chief Judge, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, ERVIN, CHAPMAN, WILKINSON, and WILKINS, Circuit Judges, sitting en banc.

PHILLIPS, Circuit Judge:

Michael Francis Charters, an involuntarily-committed psychiatric patient at the Federal Correctional Institution at Butner, North Carolina (Butner), appeals a district court order permitting the administration of antipsychotic medication over his objection. Charters contends that medicating him without his consent or a judicial determination that he is incompetent to make his own medical decisions unconstitutionally impinges upon his liberty interests. We believe the district court correctly determined that Charters' interests were adequately protected by the exercise of the professional judgment of Butner's medical personnel at the time the decision to medicate was made. Because there may have been a change of circumstances in the interval, however, we remand for such reevaluation of the situation as the medical personnel think appropriate.

I

Charters was indicted in November 1983 for threatening the President of the United States in violation of 18 U.S.C. § 871. Shortly thereafter, the government's motion for psychiatric evaluation was granted and Charters was committed to the Springfield, Missouri Medical Center for psychiatric evaluation. The Center's medical personnel diagnosed Charters as incompetent to stand trial. In early 1984, the district court referred Charters to Butner for further evaluation pursuant to then 18 U.S.C. § 4244. In February 1984, the court found Charters incompetent to stand trial and dangerous, and ordered him confined to Butner pursuant to then 18 U.S.C. § 4246 for continued evaluation and treatment. The court directed the personnel at Butner to report on Charters' mental condition within 60 days. Following receipt of the report, the court held another hearing and on June 5, 1984, issued an order continuing Charters' confinement based on his persistent incompetence to stand trial and dangerousness to himself and others. Over the next one and one-half years, the district court reviewed Charters' confinement four more times, each time ordering continued confinement based on findings of incompetence and dangerousness.

On January 17, 1986, the court made a determination consistent with its previous findings but denied the government's request to permit the medical personnel at Butner to treat Charters with antipsychotic medication over his objections. In April 1986, Charters' treating psychiatrist, the Director of Forensic Services and Clinical Research at Butner, Dr. Sally Johnson, wrote the district court, detailing Charters' condition and recommending the administration of antipsychotic medication.

In May 1986, the district court conducted a hearing to determine if Charters should be medicated. Dr. Johnson testified that Charters suffers from degenerative schizophrenia, which is incurable but can be controlled symptomatically with medication. She also testified that in his untreated condition Charters will almost certainly require indefinite confinement in an institutional setting. She noted however that, as demonstrated by previous treatment with antipsychotic medication, Charters' mental state could improve through proper medication, decreasing his dangerousness to a

level that could permit his return to the community.

The district court considered Dr. Johnson's testimony and concluded that the government's legitimate interests outweigh Charters' protected interests. The court identified the government's interests as: (1) protecting society and other inmates from a dangerous individual; (2) maintaining a pretrial detainee in a competent condition to stand trial; and (3) fulfilling its duty to treat the medical needs of the citizens in its custody. The court also determined that Charters possesses interests in liberty and privacy under the due process clause of the fifth amendment and in freedom of thought under the first amendment. These interests, the court concluded, were adequately protected by the exercise of the professional judgment of Butner's medical personnel. Based on this conclusion, the court ordered the administration of the proposed antipsychotic medication over Charters' objections but stayed its order pending an expedited appeal to this court. Charters appealed, and a panel of this court reversed the district court, holding that Charters could not be subjected forcibly to the prescribed medication without a more elaborate procedural protection prescribed by the panel. *United States v. Charters*, 829 F.2d 479 (4th Cir.1987). We then ordered rehearing en banc.

## II

All citizens possess a constitutionally protected liberty interest in remaining in free society. *Parham v. J.R.*, 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979); *Morrissey v. Brewer,* 408 U.S. 471, 480, 92 S.Ct. 2593, 2599, 33 L.Ed.2d 484 (1972). But this basic interest is extinguished for any period of legal confinement that follows commitment procedures that are compatible with due process. *See Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). This does not mean, however, that persons legally confined are stripped entirely of all protectible interests. They retain significant interests, *Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452,

2457, 73 L.Ed.2d 28 (1982); *Vitek v. Jones,* 445 U.S. 480, 491–94, 100 S.Ct. 1254, 1262–64, 63 L.Ed.2d 552 (1980), but they are not absolute. *Romeo,* 457 U.S. at 319–20, 102 S.Ct. at 2459–60. These retained interests must yield to the legitimate government interests that are incidental to the basis for legal institutionalization, *see Rennie v. Klein,* 720 F.2d 266, 273 (3d Cir.1983) (Seitz, J., concurring), and are only afforded protection against arbitrary and capricious government action. *Cf. Slochower v. Board of Higher Education,* 350 U.S. 551, 559, 76 S.Ct. 637, 641, 100 L.Ed. 692 (1956) (education employment context).

### A

The Supreme Court has recognized several constitutionally-protected interests that are retained by involuntarily committed individuals—interests in conditions of reasonable care and safety, in reasonably nonrestrictive confinement conditions, and in such training as may be required by these interests, *Romeo,* 457 U.S. at 324, 102 S.Ct. at 2462—but the Court has not yet directly held that involuntarily-committed mental patients retain a protectible interest in refusing antipsychotic medication. It has, however, assumed "for the purposes of ... discussion" that such patients "do retain liberty interests protected directly by the Constitution ... and that these interests are implicated by the involuntary administration of antipsychotic drugs." *Mills v. Rogers,* 457 U.S. 291, 299 n. 16, 102 S.Ct. 2442, 2448 n. 16, 73 L.Ed.2d 16 (1982) (citation omitted) (remanding for reconsideration in light of intervening State Supreme Court decision).

In this circuit, we have held, based in part upon the Supreme Court's recognition in *Romeo* of a protectible liberty interest in freedom from bodily restraint, that "the forcible administration of antipsychotic drugs presents a sufficiently analogous intrusion upon bodily security to give rise to such a protectible liberty interest." *Johnson v. Silvers,* 742 F.2d 823, 825 (4th Cir.1984). *See also Bee v. Greaves,* 744 F.2d 1387, 1394 (10th Cir.1984) (recognizing a similar interest); *Project Release v. Pre-*

*vost,* 722 F.2d 960, 977–79 (2d Cir.1983) (same). We hold here, therefore, that Charters possesses this constitutionally-protected retained interest.

## B

Charters does not contest the fact of his confinement. The procedures by which he was committed fully comport with due process. *Greenwood v. United States,* 350 U.S. 366, 375, 76 S.Ct. 410, 415, 100 L.Ed. 412 (1956) (finding commitment pursuant to 18 U.S.C. §§ 4244–48 constitutional). Charters was initially committed to Butner for psychiatric evaluation on the government's motion pursuant to then 18 U.S.C. § 4244.[1] This provision established the procedure for determining mental incompetency during the period "after arrest and prior to the imposition of sentence or prior to the expiration of any period of probation." Butner psychiatric personnel evaluated Charters and subsequently issued a report which concluded that Charters was mentally incompetent. Pursuant to § 4244, the district court then conducted a hearing to determine independently whether Charters was competent to stand trial. At the hearing, the court considered the evidence and testimony presented and concluded that Charters was both incompetent to stand trial and a present public danger to the officers and interests of the United States. The court then committed Charters to the custody of the Attorney General pursuant to then 18 U.S.C. § 4246 which allowed continued commitment until Charters was rendered competent to stand trial or until the charges pending against him were disposed of according to law.[2] Charters therefore came legally into the custody of the United States. *See Greenwood,* 350 U.S. at 366, 76 S.Ct. at 410. Consequently, the current limitation on his basic liberty interest is constitutionally acceptable and his retained interest in freedom from bodily intrusion must yield to the legitimate incidents of his institutionalization.

Although the retained interest must yield in certain circumstances, it still is protected against arbitrary and capricious actions by government officials. We now turn to consider, as we must, what procedural protection is constitutionally required to protect the interest in freedom from bodily intrusion that is retained by an involuntarily-committed individual after a prior due process proceeding that significantly curtails his basic liberty interest.

## III

There is of course no across-the-board prescription for procedural due process. The concept "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey,* 408 U.S. at 481, 92 S.Ct. at 2600. More specifically, the process due in particular situations

---

1. 18 U.S.C. § 4244 provided:

Whenever after arrest and prior to the imposition of sentence or prior to the expiration of any period of probation the United States Attorney has reasonable cause to believe that a person charged with an offense against the United States may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of such mental competency of the accused, setting forth the ground for such belief with the trial court in which proceedings are pending. Upon such a motion or upon a similar motion in behalf of the accused, or upon its own motion, the court shall cause the accused ... to be examined as to his mental condition by at least one qualified psychiatrist, who shall report to the court. For the purpose of the examination the court may order the accused committed for such reason-

able period as the court may determine to a suitable hospital or other facility to be designated by the court. If the report of the psychiatrist indicates a state of present insanity or such mental incompetency in the accused, the court shall hold a hearing, upon due notice, at which evidence as to the mental condition of the accused may be submitted, including that of the reporting psychiatrist, and make a finding with respect thereto....

2. 18 U.S.C. § 4246 provided in relevant part:

Whenever the trial court shall determine in accordance with sections 4244 and 4245 ... that an accused is or was mentally incompetent, the court may commit the accused to the custody of the Attorney General or his authorized representative, until the accused shall be mentally competent to stand trial or until the pending charges against him are disposed of according to law.

generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

These factors provide the framework for assessment of the procedural protections due here.

Charters and his supporting amicus, predictably emphasizing the highly sensitive nature of the individual interest at stake, contend that once an inmate has manifested objection to medication, only an elaborate two-stage procedural process is adequate to protect the interest thereby asserted. To provide it, they contend for a plenary judicial proceeding in an appropriate district court. In the first stage, an adversarial factfinding process would be used by the court to determine whether the inmate was mentally competent to make a rational decision respecting his own best interests—whether to accept the medication or not. If found competent in this respect, his objection must be honored. If found incompetent, the court would then make a "substituted" judicial judgment of the inmate's "best interests."

Given the undoubtedly sensitive nature of the individual liberty interest at stake, there may be great instinctive appeal to the notion that only a panoply of procedural protections this complex and multilayered is adequate to protect it. This was the view advanced in the vacated panel opinion

in this case, which directed just such a procedure. *See* 829 F.2d at 497–99. Two factors in particular are drawn upon to emphasize the need for so profound a set of procedural safeguards. First, the "mind-altering" quality of the proposed treatment, with all the images that evokes of the use by totalitarian states of "mind-controlling" psychiatric techniques specifically to curtail individual liberty. Second, the risk of possibly drastic mental and physical side effects of the antipsychotic medication in issue.[3]

■ The sensitivity of the interest in these respects cannot be gainsaid, but within controlling principles this does not end the search for the process due for its protection. The sensitivity of the interest, particularly in the two respects emphasized, merely identifies the nature and degree of the particular risk of error threatened by governmental decisions affecting it. Inquiry must then shift to the second and third *Mathews v. Eldridge* factors—to whether, in paraphrase, the risk of error identified is adequately guarded against by the process actually used by government, or whether, taking into account the nature of the risk, the probable value of additional or different protections, the governmental interest at stake, and the fiscal and administrative burdens involved, the further or different protections must, on balance, be required to ensure adequate safeguards. *See Mathews*, 424 U.S. at 335, 96 S.Ct. at 903.

■ Making that inquiry, we look first at the process proposed and actually used by the government. It places responsibility for making the base-line governmental decision to medicate in the appropriate medical personnel of the custodial institution. Treating this decision as essentially a "medical" one, it would find protection against error in making it, first, in the

3. The principal side-effect that may be threatened is tardive dyskinesia, a condition principally characterized by rhythmic and involuntary muscle movements which often occur in the oral region. Its specific pathology, the probability of its occurrence, its susceptibility to treatment and its durability probably cannot be more pessimistically and vividly described than

was done, relying upon selected items from the legal and medical literature, in the superseded panel opinion. 829 F.2d at 483 n. 2.

As will be noted later, a much less drastic appraisal of the risk-potential of this particular side-effect is made by responsible elements in the relevant scientific communities.

general professional competence and integrity of the government's medical personnel, and second, in the availability of judicial review to guard against arbitrariness in making particular decisions.

■ There is both general and specific precedent for finding in such a regime the procedural protections required by due process guarantees. In the first place, it has long been recognized that "[w]hat process is constitutionally due cannot be divorced from the nature of the ultimate decision that is being made." *Parham*, 442 U.S. at 608, 99 S.Ct. at 2507. Thus governmental "deprivation" decisions based essentially upon objective factual determinations of fault, or cause, or the like may require one sort of protective process, *see, e.g., Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 88–90, 98 S.Ct. 948, 954–55, 55 L.Ed.2d 124 (1978) (rudimentary adversarial fact-finding process required for student disciplinary decision), while a decision based ultimately upon subjective peer evaluations of professional academic qualifications will require another, *see, e.g., Siu v. Johnson*, 748 F.2d 238, 244 (4th Cir.1984) (non-arbitrary exercise of professional academic judgment required for academic tenure decision), and one based upon specialized scientific expertise, still another, *see, e.g., Parham*, 442 U.S. at 606–13, 99 S.Ct. at 2506–10 (non-arbitrary exercise of "medical" judgment required for decision to commit child for mental or emotional illness). It is therefore settled that in appropriate circumstances government may properly commit base-line decisions to "deprive" persons of certain liberty (or property) interests to appropriate professionals exercising their specialized professional judgments rather than to traditional judicial or administrative-type adjudicative processes. This occurs when the conflicting interests—individual and governmental—can only be assessed in those terms, and even when, as is usual, the exercise of professional judgment necessarily involves some interpretation of the disputable "meaning" of clinical "facts." *See Parham*, 442 U.S. at 609, 99 S.Ct. at 2507; *Horowitz*, 435 U.S. at 90, 98 S.Ct. at 955.

More specifically, precisely this basic regime—base-line decision committed to medical professionals, subject to judicial review for arbitrariness—has recently been upheld as comporting with due process both by the Supreme Court and this court. *See Parham*, 442 U.S. 584, 99 S.Ct. at 101 ("medical" decision to commit child for treatable mental or emotional illness); *Romeo*, 457 U.S. 307, 102 S.Ct. 2452 (*inter alia*, medical doctor's decision to put institutionalized mental patient under physical restraint);[4] *Johnson v. Silvers*, 742 F.2d 823 ("medical" decision to administer antipsychotic medication to institutionalized mental patient).

While each of these cases inevitably involved somewhat different types of medical decisions and different bases for inmate commitment, their general approval of the basic regime proposed by the government here is plain. Of particular relevance is the Supreme Court's recognition, in approving such a regime in *Parham*, that while medical and psychiatric diagnosis obviously was fallible, there was no reason to suppose that it was more so than would be the comparable diagnosis of a judge or hearing officer. *See Parham*, 442 U.S. at 609, 99 S.Ct. at 2507.

We start then with the proposition that such a regime, properly conducted, may sufficiently protect against the risk of error in making the medication decision here

---

4. The constitutional challenge to the medical decision to commit in *Romeo* was apparently made wholly on substantive rather than procedural due process grounds. The Court so treated it, holding that there was no violation of the substantive right if the decision to restrain was made by a competent professional exercising professional judgment, i.e., not acting arbitrarily. *See Romeo*, 457 U.S. at 319–23, 102 S.Ct. at 2459–62.

Though this approaches the matter in a somewhat different way than would a purely procedural due process analysis, the result in the end is the same: to approve the regime here attacked as adequate, if properly administered, to safeguard constitutionally protected liberty interests. That the two approaches are parallel, yielding the same result, was recognized by the *Romeo* Court's reference to *Parham*'s procedural due process analysis. *See id.* at 321, 102 S.Ct. at 2461 ("similar approach").

in issue, and therefore may comport with procedural due process requirements, notwithstanding the absence of any adversarial adjudicative element. The next question is whether the quite different regime proposed by Charters has such greater potential for avoiding the risk of error that it should be required notwithstanding any additional administrative or financial burdens it would impose upon the specific governmental function at issue. *See Mathews,* 424 U.S. at 335, 96 S.Ct. at 903. We are satisfied that the Charters regime does not meet that test.

The proposed alternative regime is a complicated one. As indicated, it would involve and consist entirely of a two-stage plenary judicial proceeding in district court. The first stage would address, as an issue of fact, the inmate's mental competence to determine his own best interests, with the burden on the government to disprove that special sort of competence. The second stage, if incompetence were found by the court, would address the question of the inmate's "best interests," with the judge making a "substituted judgment" for the inmate on that question. Both stages would be conducted in the adversarial mode.

Several critical features of such a regime in addition to its obvious complexity draw its potential for added protective value in serious question. First off, it skews the normal due process regimes under which the courts act simply as guarantors of due process by reviewing the adequacy of pre-deprivation process provided by various sorts of officials in various kinds of non-judicial proceedings. The proposed regime would install the federal courts as the baseline providers of procedural due process, collapsing their normal review function into this threshold function. With this would go all the cumbersomeness, expense, and delay incident to judicial proceedings every time an involuntary medication decision had to be made for any inmate. In such a regime, the role of the institutional medical personnel charged with the care and treatment of inmates would simply be that of expert witnesses defending their opinions in judicial proceedings rather than that of base-line decision makers. Presumably, their opinions, both on "competence" and "best interests," would be entitled to no greater deference than the conflicting opinions of the outside expert witnesses whose testimony surely can be anticipated.[5] District judges would thereby be cast in the role of making the primary decisions on purely medical and psychiatric questions, rather than reviewers of such decisions made by qualified professionals.

To the extent this proposed process reflects greater confidence in the ability of judges and adversarial adjudicative processes than in the capacity of medical professionals subject to judicial review to minimize the risk of error in such decision, it

---

5. As events have developed, we have a pretty clear indication of the way in which their opinions would be weighed under the proposed regime. In the aftermath of the panel decision in this case, several Butner inmates withdrew their earlier consent to prescribed antipsychotic medication, and challenged its forcible administration in the United States District Court for the Eastern District of North Carolina. That court, following the two-stage regime urged by Charters and prescribed by the panel decision, first conducted an adversarial fact finding inquiry into the inmates' mental competency to make their own "best interests" decisions. Predictably, in opposition to the Butner medical staff's opinion that they were not so "competent," an outside expert witness offered in the inmates' behalf opined that they were. Confronted with directly conflicting opinions by two professionally qualified experts, the district court, taking into account the cast of the proof burden, found

each inmate competent as a matter of fact. That of course resolved the matter under this regime; medication could not be administered. *United States v. Ballard,* No. 87–525–HC, (E.D.N.C. Nov. 19, 1987) [1987 WL 49582]. In reality, therefore, the cast of the burden upon the government results in according less rather than more deference to the decisions of institutional professionals than to the conflicting opinions of outside expert witnesses.

In poignant testimony, Dr. Johnson of the Butner staff questioned the validity of any factual inquiry into the competency of schizophrenic patients to make such decisions at particular points in time, pointing up the constantly shifting quality of their ability to make rational perceptions and to use information. The district judge, commenting upon this aspect of the matter said: "Such is the dilemma facing officials at Butner. Such also is the dilemma facing this court."

flies directly in the face of the Supreme Court's perception on that score.

Although we acknowledge the fallibility of medical and psychiatric diagnosis, *see O'Connor v. Donaldson,* 422 U.S. 563, 584 [95 S.Ct. 2486, 2498, 45 L.Ed.2d 396] (1975) (concurring opinion), we do not accept the notion that the shortcomings of specialists can always be avoided by shifting the decision from a trained specialist using the traditional tools of medical science to an untrained judge or administrative hearing officer after a judicial-type hearing. Even after a hearing, the nonspecialist decisionmaker must make a medical-psychiatric decision. Common human experience and scholarly opinions suggest that the supposed protections of an adversary proceeding to determine the appropriateness of medical decisions for the commitment and treatment of mental and emotional illness may well be more illusory than real.

*Parham,* 442 U.S. at 609, 99 S.Ct. at 2507.

To the extent it would relegate the institutional medical professionals officially charged with the care and treatment of mental patients to the roles of mere expert witnesses defending their opinions against those of non-treating, outside expert witnesses, it flies in the face of the Court's perception that in this type situation the decisions of such institutional professionals should be treated by courts as "presumptively valid." *See Romeo,* 457 U.S. at 323 & n. 30, 102 S.Ct. at 2462 & n. 30.

Finally, by requiring a preliminary factual determination of the inmate's mental competence to decide his own best interests in receiving or declining medication, this regime would pose an unavoidable risk of completely anomalous, perhaps flatly inconsistent, determinations of mental competence by different judicial tribunals. It must be recalled that Charters (as would be all similarly situated inmates), has already been properly adjudged "so mentally incompetent as to be unable to understand the [criminal] proceedings against him or properly to assist in his own defense" under former 18 U.S.C. § 4244. That solemn

judicial adjudication still stands. The proposed regime contemplates that without altering that extant determination of incompetence to assist in his defense he might now be judicially determined nevertheless competent to determine his own best interests in receiving or refusing medication. While in theory there may be a difference between the two mental states, it must certainly be one of such subtlety and complexity as to tax perception by the most skilled medical or psychiatric professionals. To suppose that it is a distinction that can be fairly discerned and applied by even the most skilled judges on the basis of an adversarial fact-finding proceeding taxes credulity. The resulting threat of wholly inconsistent or highly anomalous adjudications is palpable, and poses high risks to the integrity and trustworthiness of the courts' already perilous involvement—out of necessity—in the adjudication of complex states of mental pathology.

As indicated, Charters and his associated amicus, the American Psychological Association, urge as the special value, indeed the necessity, for the more complex regime they propose the special risk of drastic side-effects posed by the antipsychotic medication here in issue. We recognize that the possibility of the sort of dramatic side-effects Charters posits introduces an element in the risk of error that requires special concern. But the question remains whether it is an element so unique that it requires skewing the basically approved regime for insuring due process in making "medical decisions" affecting legally institutionalized mental patients. We are satisfied that it does not.

These side-effects, whose possibility in specific cases is conceded by all, are simply one element in the "best interests" decision, and an element that does not make it any less a "medical" one. Without exhaustive analysis of the scientific literature before us documenting these side-effects and their statistical probability, it suffices to observe that while there is universal agreement in the relevant professional discipline that the side-effects always exist as a risk, there is wide disagreement within those disciplines as to the degree of their severi-

ty, their susceptibility to treatment, their duration, and, most significantly, their probability over the run of cases. This is nowhere better illustrated than in the basic differences on these points between the two major associational *amici* who appear on opposite sides in this appeal: the American Psychological Association supporting Charters' position, the American Psychiatric Association supporting the government's.[6]

These differences that we are told exist within the scientific community simply serve to emphasize that the side-effects question is simply and unavoidably an element of the ultimate "best interests" medical decision. No scientific opinion is advanced that these side-effects are so highly probable, so severe, and so unmanageable that the antipsychotic medication simply should never be administered by the medical profession even with patient consent. All concede that it may be in the best interests of all concerned, including the patient, in some cases. In this circumstance, we are persuaded that the potential for these specific side-effects does not require substitution of the procedural regime proposed by Charters for that proposed by the government. We are satisfied that as an element of the ultimate "best interests" medical decision, the side-effects threat can better be assessed and reviewed within the government's proposed regime than by an adversarial adjudicative process.

Finally, Charters claims an added value —amounting to necessity—for his proposed regime because of the necessity to protect the patient's right—if mentally competent to do so—to make the medication decision for himself, with the resulting necessity that his competency be determined preliminarily by a neutral factfinder. We have already pointed up the risk of anomalous, possibly inconsistent, "competency" adjudications that this might produce. Aside from that, we are not convinced that giving over the determination of this narrow, special dimension of mental competency to non-specialist judges and the adversarial process offers a better protection against error than would leaving it in the first instance to responsible medical professionals, subject to judicial review for arbitrariness. No one contends that the patient's desire is not a factor to be taken into account—if the patient's mental competence to make an informed decision can be assumed. Indeed, the regime proposed by Charters and his associated amicus concedes the ultimate necessity for a "substituted judicial judgment" that medication should be administered if he is found incompetent to make that judgment for himself.

As with the potential for side-effects, we are satisfied that the patient's competence to make an informed judgment in this matter is properly treated as simply another

---

**6.** There is no reconciling, nor any possible basis for judicial choice between, the opposing scientific assessments of the risk of this and other side-effects that are advanced in the respective amicus briefs and supported in each by apparently respectable scientific authority. It is possible, however, to give a fair summation of their positions here.

The American Psychological Association, supporting Charters, while conceding that antipsychotic drugs are "highly beneficial for many patients" seems to contend that they pose such a "high risk" of "substantial side effects" that it would be better to risk errors of incompetent judgment by the mental patient in declining the medication than to risk the errors of professional misjudgment in administering the medication. This *amicus* also apparently advances the ultimate anti-paternalist, libertarian notion that forcible administration of this sort of medication poses such a threat to "individual autonomy and dignity," aside from physical and men-

tal effects, that even successful treatment by the government is not justified. *See* Amicus Br. pp. 5–35.

On the other side, the American Psychiatric Association, supporting the government's position, asserts that side-effects, including tardive dyskinesia, pose no such "substantial" risk as that asserted by Charters; that most can be controlled by lowering dosages or by other medication, and that the duration of most is limited to the period of medication. As to tardive dyskinesia itself, this *amicus* asserts that the incidence is much lower than that asserted by Charters and his associated *amicus,* that among those afflicted, the condition is "most often mild," and that it but very rarely results at all from short-term usages. Amicus Br. 12–13. As to the view that in the interests of individual autonomy and dignity even unwise patient judgments must be honored by institutional professionals, this amicus simply disagrees. *Id.* at 5.

factor in the ultimate medical decision to administer the medication involuntarily. We are further satisfied that the risk of error in making that specific competency determination is adequately guarded against by the government's procedural regime. Arbitrariness in making it is no less susceptible to judicial review than is arbitrariness in making other determinations leading to the ultimate decision.

Finally to be weighed in the balance is the governmental interest at stake, and the administrative and fiscal burdens that would be imposed by Charters' proposed regime. It has to be recalled that the government's role here is not that of punitive custodian of a fully competent inmate, but benign custodian of one legally committed to it for medical care and treatment—specifically for psychiatric treatment. In this relationship the government is under a specific statutory duty to attempt to restore mental competency so that the patient may be returned to the free society. *See* 18 U.S.C. §§ 4241(d), 4246(d). In these circumstances, the imposition of extensive administrative burdens upon the government's efforts to discharge this affirmative obligation must be weighed with great care in the due process balance. Charters' proposed regime would impose exceedingly heavy burdens of this kind, making it practically impossible for the responsible medical personnel to act as expeditiously as sound medical judgment might dictate in some circumstances. Indeed, it seems clear that under Charters' proposed regime any manifestation of objection to medication by a patient would effectively stymie the government's ability to proceed with the treatment—certainly for an interval that might make it no longer efficacious, and probably indefinitely.[7]

All factors considered, we are satisfied that the basic regime proposed by the government for making the medication decision in issue is adequate, if properly administered, to comply with due process requirements. We do not believe that adequate protection here requires substitution of the pre-medication adjudicative regime proposed by Charters.

## IV

Having concluded that the government's regime is adequate, if properly administered, to provide the process due, it is necessary—because of the posture in which we now consider the case—to address the question of its proper administration in this (and necessarily comparable) cases.

■ Again, fairly specific guidance has been provided by the Supreme Court. The basic principle is that a legally institutionalized mental patient is entitled to the exercise of "professional judgment" by those who have the responsibility for making medical decisions that affect his retained liberty interests. *Romeo,* 457 U.S. at 321, 102 S.Ct. at 2461; *Parham,* 442 U.S. at 607–09, 99 S.Ct. at 250–08. This is the process due such a person in this particular circumstance, and its nature dictates both the way in which the decision is to be made by the responsible professionals and how it is to be reviewed if presented to the courts for that purpose.

Making an acceptable professional judgment of the sort here in issue does not require any internal adversarial hearing. *Parham,* 442 U.S. at 607, 99 S.Ct. at 2506 ("not necessary that the deciding physician conduct a formal or quasi-formal hearing"). The decision may be based upon accepted medical practices in diagnosis, treatment and prognosis, with the aid of such technical tools and consultative techniques as are appropriate in the profession. *Id.* at 607–08, 99 S.Ct. at 2506–07. Without attempting a definitive checklist, it is obvious that a decision of the type here in issue should involve consideration of such factors as the patient's general history and present condition, the specific need for the medication, its possible side-effects, any previous reaction to the same or comparable medication, the prognosis, the duration of any previous medication, etc. *Rennie v. Klein,* 653 F.2d 836, 848 (3d Cir.1981) (en banc). Just as obviously, the basis for the decision should

7. *See* note 5, *supra.*

be supported by adequate documentation, not only because of normal professional requirements, but as a potential aid to judicial review. One could of course imagine any number of special internal review and consultative practices specifically designed to ensure confidence in the professional basis of specific medical decisions, and medical professionals, aware of the constitutional standard under which they are operating, are of course free to employ any that seem appropriate.

■ The "professional judgment" standard also dictates the scope of judicial review. Under that standard, the question presented by a judicial challenge such as Charters' is not whether the treatment decision was the medically correct or most appropriate one. It is only whether the decision was made by an appropriate professional[8] in the exercise of professional judgment, i.e., not arbitrarily. *See Siu,* 748 F.2d at 245. Due process is denied under this standard only if the decision was reached by such a "substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Romeo,* 457 U.S. at 323, 102 S.Ct. at 2462.

This approach properly makes inappropriate any attempt by the courts to determine the "correct" or "most appropriate" medical decision from among the variety of opinions that might be advanced on that point by medical experts. It makes relevant only one question for any experts called to opine in such a proceeding: was this decision reached by a process so completely out of professional bounds as to make it explicable only as an arbitrary, nonprofessional one. This standard appropriately defers to the necessarily subjective aspects of the decisional process of institutional medical professionals, *Romeo,* 457

U.S. at 322–23, 102 S.Ct. at 2461–62, and accords those decisions the presumption of validity due them. *Id.* at 323, 102 S.Ct. at 2462.

The district court—probably conducting a broader inquiry and applying a standard of review even more favorable to Charters than the above principle of deference required—nevertheless concluded that the decision forcibly to administer antipsychotic drugs was made in the exercise of professional judgment. The court properly took into account the medical bases upon which the decision was made, conducting a careful inquiry into the diagnostic procedures followed. Significantly, no evidence was offered that the decision lay completely beyond the bounds of tolerable professional judgment. This undoubtedly reflects the fact that no such evidence was available. It is indisputably the case—whatever differences of opinion in detail may exist within the relevant professional community— that substantial portions of that community accept this form of treatment as not only appropriate in particular cases—but as the generally preferred treatment for serious cases. *See, e.g.,* Baldessarini & Lipinski, *Risks of Antipsychotic Drugs Overemphasized,* 305 N.E.J. of Med. 588 ("the use of available antipsychotic agents continues to be the cornerstone of management for these serious and disabling mental illnesses"); Kane, *Treatment of Schizophrenia,* 13 Schizophrenia Bull. 133, 134 (1987) ("Antipsychotic drugs remain the primary modality in the treatment of an acute episode or an acute exacerbation of a schizophrenic illness").

## V

■ We therefore conclude that the district court did not err in approving forcible administration of the medication prescribed

---

8. In *Romeo,* the Supreme Court defined "professional" as:

> a person competent, whether by education, training or experience, to make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded. Of course, day-to-day decisions regarding care—including decisions that must be made without delay—necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons.

457 U.S. at 323 n. 30, 102 S.Ct. at 2462 n. 30.

for Charters on the basis of the record before it when it ruled.

There remains, however, the question of the appropriate remand at this point. Considerable time has elapsed since that medical decision was made and reviewed. We cannot assume that the same medical decision would be made now—though of course it might be. Under the circumstances, we think there is no recourse but to require that before medication is administered the appropriate medical professionals reevaluate the situation in light of present conditions and make a new decision before proceeding.

■■■ That decision should of course be now made under the procedures that we have suggested are required to meet the "professional judgment" standard. We observe that under the regime we have approved there is no requirement that, as a matter of due process, every medication decision by responsible medical professionals be submitted by the government for prior judicial approval before proceeding to carry it out. Such prior approval may of course be sought if desired, but under the approved regime such a decision is of a piece with other pre-deprivation governmental decisions such as those leading to job or social benefit terminations, prison transfers, disciplinary sanctions, and the like. Those decisions are of course routinely acted upon without prior judicial approval. Though their implementation is always subject to challenge by the aggrieved party, hence to the risk of liability if illegally or unconstitutionally made, we assume that medical professionals, now aware of the standard to which they are held, may be as willing to proceed without prior judicial approval as are other governmental officials such as those on prison disciplinary committees, civil service boards and the like.

■■■ Finally we must take into account that the United States District Court for the Eastern District of Virginia, whose judgment we review, is not the proper court to review future medical decisions respecting Charters' treatment and continued custody. The proper court, so long as Charters remains in custody at the Butner facility, is the United States District Court for the Eastern District of North Carolina. *See* 18 U.S.C. § 4246(a). We therefore will remand this case to the United States District Court for the Eastern District of Virginia, with directions to that court to transfer the case to the United States District Court for the Eastern District of North Carolina. The latter court should then hold the case in an inactive status pending further motions by Charters or the government respecting his treatment or custody, and should act on any such motions (or independent actions raising these issues) in accordance with this opinion.

SO ORDERED.

HARRISON L. WINTER, Chief Judge, concurring:

Although I initially concurred in the panel opinion, on rehearing in banc I am persuaded by the correctness of what Judge Phillips has written.

I concur in his opinion.

MURNAGHAN, Circuit Judge, dissenting:

Judge Phillips excels both as a wordsmith and as a thinker. It, therefore, is difficult to enter the lists as his opponent. Yet, here is a case where his words simply fail to convince me. My contrary views are set out in the vacated panel opinion, *United States v. Charters*, 829 F.2d 479 (4th Cir. 1987). To attempt, point by point, to reemphasize the extent of our disagreement will serve little purpose and will merely appear to be an attempt to denigrate the style and thought processes of one whom I truly admire. I will, therefore, restrict myself to the questioning of an attempt to exalt the dependability, as specialized professional judgments, of opinions of government medical personnel because of their "duty to attempt to restore mental competency so that the patient may be returned to the free society."

The majority deferentially places in the hands of government personnel the question of whether the antipsychotic medication should be compelled over Charters' unambiguous objections. The prospect that the views of a governmental medical official may be inclined to coincide with those of the federal prosecutor on the desirability of the trial's proceeding and a resulting conviction leading to lengthy incarceration is not remote.[1] They are, when all is said and done, fellow employees.

Nor should we ignore the likelihood that Butner would rather be freed of the concerns such as diversion of experts it would rather detail to other tasks than the care of Charters. It may well be that something other than Charters' well-being drives the opining medical officials. I find due process lacking when the effective last word rests finally with government medical officials on whether an incompetent Charters—incompetent to stand trial, not, however, having been shown to be incompetent to make a rational decision as to whether to submit to antipsychotic medication—should be forced against his will to submit to antipsychotic medication with serious adverse medical risks. Fairness requires the assurance of an unbiased decision. That is the function of a court proceeding where one like Charters can be assured of competent independent representation and unbiased testimony.

The legal system under which we operate favors the presentation of opposing views. One side effectively unopposed is not enough. I respectfully dissent.