Joseph FREEMAN, 067 62 0097, Private (E-1) U.S. Marine Corps, Petitioner,

v.

R.C. STUART, LtCol, USMC, Military Judge, Sierra Judicial Circuit, Respondent.

NMCM No. 910424 M.

U.S. Navy–Marine Corps Court of Military Review.

11 July 1991.

Maj R.A. Coulter, USMC, Defense Counsel.

Capt F.C. Mielke, USMCR, Defense Counsel.

LT Tamara A. Massengale, JAGC, USNR, Appellate Defense Counsel.

LCDR Lawrence W. Muschamp, JAGC, USN, Appellate Government Counsel.

ORR, Judge:

In November 1987, the petitioner was convicted at a general court-martial of the intentional infliction of grievous bodily harm, assault with a dangerous weapon, assault consummated by a battery, and two specifications of disrespect toward his superior commissioned officer. That conviction was set aside by this Court because the petitioner was found to be incompetent to conduct his own defense and the military judge erred in permitting the petitioner to proceed *pro se*. *United States v. Freeman*, 28 M.J. 789 (N.M.C.M.R.1989). The Government subsequently sought to retry the petitioner for essentially the same offenses, and a second general court-martial was convened on 28 August 1989. The petitioner again sought to proceed *pro se*, but the military judge denied the request after considering the information obtained through his use of a list of questions and considerations appended to our earlier decision. 28 M.J. at 796. Following the reassignment of counsel, the defense requested and was granted a continuance to obtain additional opinions concerning the petitioner's mental competence. When the court reconvened on 30 November 1989, the military judge found that the petitioner was not then competent to stand trial and, on 1 December 1989, granted a defense request for a stay of the proceedings. Finding that

he lacked the authority to make such an order, the military judge declined to grant a defense request that he order the petitioner be committed to the U.S. Medical Center for Federal Prisoners [hereinafter the "Center"] in Springfield, Missouri, for treatment. The Center is an activity under the jurisdiction of the Federal Bureau of Prisons, which is an agency of the U.S. Department of the Interior.

Shortly thereafter, the convening authority determined (1) that there was no Navy medical facility capable of keeping the petitioner in pretrial confinement for the length of time necessary to both identify and administer the medical treatment needed to restore the petitioner to sufficient competency to stand trial and (2) that the appropriate care and treatment could not be provided in a Navy Department confinement facility. Consequently, the convening authority arranged for the transfer of the petitioner to the Center, a facility he found to be adequate to ensure the petitioner's safekeeping and to be capable of identifying and providing the necessary medical care. At the Center, the petitioner was ultimately treated with the antipsychotic medication, Haldol, and another medication to counteract Haldol's side effects. In July 1990, the treating psychiatrist at the Center determined that the petitioner's primary mental condition was in remission and that the petitioner, in his opinion, was competent to stand trial. He recommended, however, that the petitioner "be maintained on medication for the foreseeable future." The petitioner was then released from the Center and returned to the brig at the situs of the general court-martial proceeding.

Immediately following his return to military control, the petitioner sought to discontinue his medical treatment by entering into a "memorandum of understanding" between himself, his defense counsel, and brig medical personnel to gradually withdraw all antipsychotic medication.[1] Consequently, by the time the court-martial reconvened on 23 January 1991 for the purpose of hearing the Government's request to dissolve the stay, two psychiatrists testified that the petitioner was no longer competent to stand trial, while a psychologist, who had evaluated the petitioner 3 months earlier, testified that the petitioner was competent. On 24 January 1991, the military judge found by a preponderance of the evidence that the petitioner was not competent and declined to lift the stay.

At a conference requested by the petitioner's defense counsel under Rule for Courts–Martial (R.C.M.) 802 and held on 29 January 1991, the military judge asked the trial and defense counsel to research a variety of issues concerning the status of the petitioner and the military judge's authority to resolve other issues in the case.[2] At that hearing, the petitioner's defense counsel was advised by the trial counsel that the convening authority intended to transfer the petitioner back to the Center, and a written request to that effect was forwarded to the Center that day.

Another R.C.M. 802 conference was held on 19 February 1991 at the request of the petitioner's defense counsel who sought to have the military judge issue an order prohibiting the petitioner's transfer to the Cen-

---

1. It is unclear what authority exists in the Naval Service for such a "memorandum of understanding" since, among other possible military discipline considerations, there is no indication that the medical personnel involved consulted with the petitioner's commanding officer or the convening authority concerning the withdrawal of medication considered necessary to maintain a level of competency adequate for the patient to respond to charges at a court-martial and to participate in his defense. *Cf.* Manual of the Medical Department, U.S. Navy (NAVMED P–117), art. 2–18. Certainly, the matter of maintaining a servicemember's mental competency is not a unilateral matter to be decided solely by either the servicemember or the medical officer

or bilaterally between the medical officer and the servicemember. *See* NAVMED P–117, art. 2–8(2) ("In addition, the medical officer will be responsible under the commanding officer, for maintaining the health of the personnel of the command ...").

2. The information concerning events following the military judge's refusal to lift the stay on 24 January 1991 is derived from the pleadings and documents filed with this Court. An unauthenticated transcript of the trial court's proceedings from 28 August 1990 to 24 January 1991 was submitted with the pleadings in this case.

ter. (The reason for this reversal of the defense position on the transfer of the petitioner to the Center is not expressed and, at this point, can only be a matter of speculation.) It appears, however, that the petitioner had already departed for the Center some three hours earlier. Nevertheless, the military judge declined to issue such an order and, on 21 February 1991, indicated that he lacked the authority to hold a hearing under Article 39(a), Uniform Code of Military Justice (UCMJ), in the involuntary absence of the petitioner or to act on various motions filed by the defense counsel.

On 26 February 1991, the defense counsel filed a petition with this Court seeking extraordinary relief in the nature of the following writs:

(1) a writ of habeas corpus ordering the military judge to release the petitioner from pre-trial confinement due to a violation of the petitioner's rights under the 8th and 14th Amendments of the U.S. Constitution;

(2) a writ of habeas corpus ordering the military judge to release the petitioner from pre-trial confinement based on the existence of new information which was not available to the original investigating officer under R.C.M. 305(j)(1)(B);

(3) a writ of mandamus ordering the military judge to order the Government to provide necessary and relevant witnesses to determine whether, as an interlocutory matter, the petitioner meets the requirements of Article 50(a), UCMJ, 10 U.S.C. § 850(a);

(4) a writ of mandamus ordering the military judge to dismiss all charges due to existence of an affirmative defense of lack of mental responsibility;

(5) a writ of mandamus ordering the military judge to dismiss all charges due to lack of a speedy trial;

(6) a writ of mandamus ordering the military judge to dismiss Specification 1 of Charge II based on the petitioner's lack of the required specific intent; and,

(7) a writ of prohibition ordering the Center to prohibit treatment of the petitioner with antipsychotic medication pending this Court's adjudication of the legal issues raised by this petition.

The following day, the petitioner's defense counsel filed a request for an expedited ruling on that portion of the petition requesting a writ of prohibition. On 1 March 1991, we issued an order denying the request for a writ of prohibition, and on 7 March 1991, the Government was ordered to show cause why the petition should not otherwise be granted. On 11 March 1991, the petitioner filed a motion requesting reconsideration of our order denying the writ of prohibition and requesting that the convening authority and the United States of America be added as respondents. That motion was granted by our order on 8 April 1991.

Initially addressing the writ of prohibition, we note that the Center is not and has never been a party to this proceeding.[3] Consequently, in the interests of judicial economy, we view this aspect of the petition as a request for a writ of prohibition directed to the convening authority to prevent further involuntary medication of the petitioner.

 In support of his request for the issuance of this writ, the petitioner cites the Manual of the Medical Department, U.S. Navy (NAVMED P–117) [hereinafter the "NAVMED Manual" or the "Manual"], as authority for his assertion that Navy policy prohibits the involuntary administration of antipsychotic medication under the circumstances of this case. We find no such policy stated in the Manual, and even if such a policy existed, it has no application to the Center or to the convening authority. In issuing the Manual, the Chief of the Bureau of Medicine and Surgery states:

1. The Manual of the Medical Department ... concerns matters over which the Chief, Bureau of Medicine and Sur-

---

3. Some authority exists for the proposition that this Court may have the "authority to issue extraordinary writs to prevent members of the Executive Branch from interfering with the military justice system...." *Court of Military Review v. Carlucci*, 26 M.J. 328, 330 (C.M.A.1988).

gery exercises command, control, or supervision.

2. Designated articles of ... [the Manual] establish mandatory regulations that must be adhered to by all *Medical Department* commands and personnel.... These mandatory regulations are marked "Regulatory."

3. Articles not designated "Regulatory" are for the guidance of commanding officers, officers in charge, and all other members *of the Medical Department.*

NAVMED Manual, ii (emphasis added). Consequently, by its terms, the Manual does not apply to the Center, which is not an activity in the Medical Department of the U.S. Navy. In addition, neither the convening authority in this case, Brigadier General H. Blot, USMC, as Commanding General, V Marine Expeditionary Force, nor his command is part of the Medical Department of the U.S. Navy. The petitioner has not asserted that the convening authority is not permitted to seek medical care or treatment for a servicemember under his authority outside Navy medical facilities when the convening authority has determined that those facilities are unable or are inadequate to provide care or treatment in the environment required by the particular circumstances. We find that the convening authority, as the officer exercising general court-martial jurisdiction over the petitioner, has the same responsibility toward the petitioner as the petitioner's commanding officer, who is responsible for. the petitioner's health under applicable departmental regulations. *See* U.S. Navy Regulations, 1990, art. 0820.

■ As we have stated, however, even when the petitioner's medical care and treatment are returned to U.S. Navy Medical Department personnel, we do not agree with the petitioner's assertion that Navy policy prohibits the involuntary administration of antipsychotic medication to the petitioner. In article 2–18, entitled "Compulsory Medical or Surgical Treatment (Regulatory)", the Manual provides:

(1) By authority delegated by the Secretary of the Navy, and with the approval of the commanding officer, the senior medical ... officer ... of a ship or station, after consultation with other medical ... officers if available, will, where in the medical officer's judgment the best interests of the individual *or of the service* require, take the following measures with or without the consent of the individual concerned:

. . . .

(b) Care necessary to protect the life or health of a member who is considered by a psychiatrist to be mentally incompetent.

. . . .

(2) Reference should be made to article 18–15 for guidance concerning the disposition of naval personnel who refuse medical, surgical, dental, or related diagnostic measures.

NAVMED P–117, art. 2–18 (emphasis added). We do not read the quoted portion of this article so narrowly that a servicemember, who based on expert medical opinion must take antipsychotic medication to remain competent, may unilaterally refuse the medication while he remains a member of the armed forces as soon as, through the use of the medication, he becomes competent. Even if the article is not so construed, the commanding officer concerned or the senior medical officer concerned could seek additional authorization or a waiver of the restriction in a particular case to resolve the circular dilemma that would otherwise confront military authority. We do not find the reference to article 18–15 of the Manual to be helpful. That article either contemplates that the medical measures in issue will make the servicemember fit for full duty, addresses only the surgical treatment of mentally incompetent servicemembers, or invokes administrative measures aimed at the member's separation without benefits. Article 18–15 simply does not address the issue or the situation raised in this petition.

■ Since we find no Navy policy preventing the involuntary administration of antipsychotic medication for the purpose of restoring competency, we turn to the legal restrictions that may apply. In that regard, the petitioner cites *Perry v. Louisi-*

*ana,* —— U.S. ——, 111 S.Ct. 449, —— L.Ed.2d —— (1990) (mem.), and *Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). The former case involved the possible execution of a convicted criminal who was mentally incompetent, and the U.S. Supreme Court remanded the case to the 19th Judicial District Court of Louisiana in light of the Supreme Court's earlier decision in *Harper. Perry,* 111 S.Ct. at 1029. In the latter case, Harper, a convicted criminal who was serving a sentence to confinement in the Washington State Penitentiary, filed suit under 42 U.S.C. § 1983 in state court claiming that he was entitled to a judicial hearing before the State of Washington could administer antipsychotic medication to him involuntarily. The Washington Supreme Court essentially agreed with Harper. The U.S. Supreme Court granted certiorari, however, and reversed the Washington court's decision. 494 U.S. at 216–20, 110 S.Ct. at 1034–35, 108 L.Ed.2d at 195–96.

The U.S. Supreme Court identified a substantive issue and a procedural issue in *Harper:* "[T]he substantive issue is what factual circumstances must exist before the State may administer antipsychotic drugs to the prisoner against his will; the procedural issue is whether the States' non-judicial mechanisms used to determine the facts in a particular case are sufficient." *Id.* 494 U.S. at 220, 110 S.Ct. at 1036, 108 L.Ed.2d at 197. In analyzing the substantive issue, the Court identified two principles that "apply in all cases in which a prisoner asserts that a prison regulation violates the Constitution." *Id.* 494 U.S. at 224, 110 S.Ct. at 1038, 108 L.Ed.2d at 199. The first of these two principles involved the proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights, which is "to ask whether the regulation is 'reasonably related to legitimate penological interests.' ", *Id.* [citation omitted]. The second principle is "that inmates retain at least some constitutional rights despite incarceration with the recognition that prison authorities are best equipped to make difficult decisions regarding prison administration." *Id.* [citations omitted].

It is apparent from this much of the Court's analysis that its decision in *Harper* has little application to the situation before us. At a minimum, the petitioner is not a sentenced prisoner (consequently his constitutional protections have not been affected by any incarceration as a result of a criminal conviction), the Government's interest in restoring the petitioner's mental competency are not just penological (the Government's interest in bringing the petitioner to trial is not limited to simply making the petitioner a potentially more manageable prisoner or a more productive and less dangerous member of society upon his release from confinement), and the petitioner is in and the offenses are alleged to have occurred in a specialized segment of society whose leaders are charged by law with a greater interest in the health and welfare of its members and the maintenance of good order and discipline within that segment of society than otherwise exists in the society at large.

A situation more closely akin to the petitioner's was addressed by the U.S. Court of Appeals for the Fourth Circuit in a decision, *United States v. Charters,* 863 F.2d 302 (4th Cir.1988) (*en banc*), involving an individual who has been indicted for a violation of the U.S.Code and found incompetent to stand trial. He was incarcerated pursuant to a district court order as a psychiatric patient at the Federal Correctional Institution at Butner, North Carolina, for continuing evaluation and treatment after his initial commitment. After two years, the district court held a hearing to determine whether antipsychotic medication should be involuntarily administered to Charters as recommended by his treating psychiatrist at the correctional facility in Butner. The psychiatrist testified that Charters suffered from a mental condition that was incurable but could be controlled symptomatically with medication and that, untreated, Charters would almost certainly require indefinite institutional confinement. With the medication, however, Charters' mental condition could improve to the point where he could be released. *Id.* at 304–05.

The Court of Appeals found that: (1) Charters had a constitutionally protected liberty interest to be free from bodily intrusion, vis-a-vis the forcible administration of antipsychotic drugs, under the due process clause of the 5th Amendment; (2) since Charters did not contest his confinement, his liberty interest, already curtailed by his incarceration, yielded further to the legitimate incidents of his institutionalization; and, (3) what liberty interest Charters retained was still protected from arbitrary and capricious actions by government officials. *Id.* at 305–06. In determining the procedural due process protections required to avoid arbitrary and capricious actions by government officials, the Court of Appeals used the three factors established by the U.S. Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), as a framework. Those factors are:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

424 U.S. at 335, 96 S.Ct. at 903.

After acknowledging the sensitivity of Charters' interest in avoiding the use of antipsychotic medication, the Court of Appeals examined the process proposed and actually used by the Government in Charters' situation. That process was characterized by the Court of Appeals as placing "responsibility for making the base-line governmental decision to medicate in the appropriate medical personnel of the custodial institution." 863 F.2d at 307. Since the Court found the decision to be a medical one, it would be protected from possible error by the general professional competence and integrity of the medical personnel involved and by the availability of judicial review to prevent arbitrary decisions. *Id.* at 307–308.

We note from documents filed with us by the petitioner on 15 March 1991 that the process used by the Center concerning the decision whether to use antipsychotic medication was precipitated by the clinical opinion, based on the observation of the petitioner at the Center, that the petitioner needed the medication and was made only after a medication hearing was conducted. As part of that hearing, the petitioner was given notice of the hearing, an opportunity to call witnesses, and the opportunity to select a staff member at the Center to represent him later. A staff member was appointed to represent the petitioner at the hearing and later pursued an appeal in behalf of the petitioner. We find that the decision concerning the petitioner's treatment was made by appropriate medical personnel after following institutional procedures designed to avoid any erroneous or arbitrary decision to medicate the petitioner. Before us, the petitioner proposes no alternative regime, but only argues that he has a right to remain unmedicated. We find no such right under the circumstances of this case.

█ Since the petitioner has challenged his continued incarceration by seeking a writ of habeas corpus, we have reviewed the petitioner's contentions that his pretrial confinement violates his rights under the 8th and 14th Amendments and that new information, not available at the time of the investigating officer's initial determination under R.C.M. 305, should be considered by the military judge to order the petitioner's release. The first contention is without merit because it is premised on the petitioner's belief that the Center cannot legally medicate the petitioner involuntarily and that, if medicated at the Center, he can refuse medication as soon as he is returned to the care of Navy Medical Department personnel. We have already expressed our view of those positions in the preceding paragraphs and in footnote 1, above.

█ The second contention is premised on the assertion that the military judge is now aware that the petitioner was suffering from a mental illness at the time the offenses he is incarcerated for were com-

mitted and that, as a result of that mental illness, the petitioner was unable to appreciate the nature and quality of his acts. This assertion, as are the issues the petitioner argues in the remaining writs, is based upon a premature conclusion and would have the military judge decide a preliminary procedural matter based upon the petitioner's claim of the existence of an affirmative defense prior to conducting an actual trial. We find no illegality in the petitioner's continued pretrial confinement.

Likewise, we find no basis in the record that now exists on which to grant the petitioner any of the relief requested. We note that the briefs the petitioner has filed in support of his petition identify issues that are not raised in the petition and the petition identifies issues that are not argued in either of the briefs. The majority of these issues raise factual questions concerning possible defenses or possible deficiencies in the Government's ability to prove elements of the offenses even though the court has not been assembled, the petitioner has not entered pleas, and no evidence on the merits has been offered.

Accordingly, the petition seeking extraordinary relief in the form of writs of habeas corpus, writs of mandamus and, upon reconsideration, a writ of prohibition is denied. In addition, the appellant's motions for joinder and for reconsideration of our order dismissing the appellant's second petition concerning the appellant's two previous special courts-martial convictions, filed June 25, 1991, and the appellant's motion for a stay of proceedings at the trial level, filed July 2, 1991, are denied.

Chief Judge WILLEVER and Senior Judge STRICKLAND concur.