**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ROBERT W. BETTS, II,
Plaintiff-Appellant,

v.

No. 97-1850

THE RECTOR AND VISITORS OF THE
UNIVERSITY OF VIRGINIA,
Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Virginia, at Charlottesville.
James H. Michael, Jr., Senior District Judge.
(CA-96-54-C)

Argued: January 26, 1998

Decided: September 22, 1999

Before ERVIN* and WILLIAMS, Circuit Judges,
and GOODWIN, United States District Judge for the
Southern District of West Virginia,
sitting by designation.

_____

Affirmed in part, reversed in part, and remanded by unpublished opin-
ion. Judge Williams wrote the opinion, in which Judge Goodwin
joined. Judge Ervin wrote a separate opinion concurring in the judg-
ment.

_____

*Judge Ervin participated in the consideration of this case but died
prior to the time the decision was filed. The decision is filed by a quorum
of the panel pursuant to 28 U.S.C. § 46(d).

**COUNSEL**

**ARGUED:** Dexter Brock Green, JONES & GREEN, Charlottesville, Virginia, for Appellant. Richard Croswell Kast, Associate General Counsel/Special Assistant Attorney General, Office of the General Counsel, UNIVERSITY OF VIRGINIA, Charlottesville, Virginia, for Appellee. **ON BRIEF:** Paul J. Forch, General Counsel/Special Assistant Attorney General, Office of the General Counsel, UNIVERSITY OF VIRGINIA, Charlottesville, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

WILLIAMS, Circuit Judge:

Robert W. Betts appeals the district court's grant of summary judgment to the Rector and Visitors of the University of Virginia (the University) on his claims brought under the Americans with Disabilities Act (ADA), see 42 U.S.C.A. § 12101 et seq. (West 1995 & Supp. 1998), the Rehabilitation Act, see 29 U.S.C.A. § 701 et seq. (West 1999), the United States Constitution, see U.S. Const. amend. XIV, and state contract law. With the exception of Betts's ADA and Rehabilitation Act claims, we affirm in all respects. As for those claims, we agree with Betts that if double time on exams is a reasonable accommodation, which we expressly do not decide here, Betts is able to meet the essential eligibility requirements set forth by the University for admission to the University of Virginia School of Medicine (the School of Medicine) through its now defunct Medical Academic Advancement Post-Baccalaureate (MAAP) program and, therefore, is a "qualified" individual for purposes of the ADA. Because the district court assumed, without deciding, that Betts was disabled, we remand for the district court to determine, in the first instance, whether Betts is "disabled" under the ADA.

2

I.

In the spring of 1995, Betts applied for admission to the School of Medicine and was placed on the waiting list. As an alternative to remaining on the waiting list, Betts was offered (and accepted) admission into the University's MAAP program. MAAP was an intensive one-year post-college academic program designed to prepare economically disadvantaged and minority students for admission to the School of Medicine. In fact, the University guaranteed admission to the School of Medicine to every MAAP participant who maintained a minimum grade point average (GPA) of 2.75 per semester and received no grade below a C.

Betts began the MAAP program in June of 1995. After the fall semester, Betts had a GPA of 2.2 and had received a D- in physics. Despite his failure to meet the minimum academic requirements of the MAAP program, the MAAP Promotions Committee informed Betts on January 16, 1996, that he would be allowed to remain in the MAAP program, albeit on probation, for the spring semester. As a condition of his probation, Betts was required (1) to meet with Dr. Lynn Davis and Dr. Fred Diehl for instructions on which courses he must take during the spring semester; (2) to arrange for tutoring; and (3) to submit to testing at the University's Leaning Needs and Evaluation Center (the LNEC). Moreover, under the terms of Betts's probation, a decision on whether he would ultimately be allowed to enter the School of Medicine would be left to the judgment of the MAAP Promotions Committee upon its review of his spring semester grades.

Pursuant to the agreement, Betts was examined by the LNEC, which concluded that Betts had "high average verbal conceptual skills and average intellectual ability," (J.A. at 431), but had "difficulties with short-term memory [and] reading speed," (J.A. at 59.) The LNEC recommended that Betts be given double time for all future examinations. Upon receiving the recommendation, the University immediately doubled the allotted time Betts was previously permitted on exams.

During the spring semester, Betts took five exams with the enlarged time. On these five exams, Betts attained a GPA of 3.5 and received no grade below a B. Because several of Betts's spring

3

semester exams were taken prior to the double time modification, however, Betts had only a GPA of 2.84 for the spring semester. As a result, Betts had a cumulative GPA of 2.53 for the year.

On May 28, 1996, the MAAP Promotions Committee concluded that Betts had failed to demonstrate that he was prepared to enter the School of Medicine. That decision was based on Betts's "failure to meet the overall GPA standard of 2.75 for the academic year." (J.A. at 60.) As a consequence, Betts's offer of admission to the School of Medicine was rescinded. Betts appealed to Robert M. Carey, the Dean of the School of Medicine. On June 10, 1996, Betts was informed that the Promotions Committee's decision would be upheld.

Shortly thereafter, the University offered Betts an opportunity to appear before Dean Carey, Beth Bailey, the Admissions Director, and Dr. Benjamin Surgill, the Associate Dean for Admissions. During that meeting, Betts, with his counsel present, was offered another chance to enter the School of Medicine on newly revised terms.[1] Rather than accepting the offer, Betts filed a complaint in the United States District Court for the Western District of Virginia, alleging that the University violated the ADA, see 42 U.S.C.A.§ 12101 et seq. (West 1995 & Supp. 1998), the Rehabilitation Act, see 29 U.S.C.A. § 701 et seq. (West 1999), the United States Constitution, see U.S. Const. amend. XIV, and Virginia state contract law when it rescinded his offer of admission to the School of Medicine. On August 12, 1996, Betts also sought injunctive relief requiring the University to place him into the 1996-1997 School of Medicine class and requiring the University to reinstate his financial aid.[2]

On August 15, 1996, the district court conducted a hearing on whether preliminary injunctive relief was warranted. On August 16,

_____

[1] Under the newly revised terms, Betts would be required to (1) take an additional twelve credits of course work, in which he would be given double time on exams; (2) retake the Medical College Aptitude Test (MCAT), again, using double the time allotted other students; and (3) attain a minimum GPA of 3.25, receive no grade lower than a C, and achieve an average score of 8 on the MCAT, with no individual score below 7.

[2] Classes were scheduled to begin on August 19, 1996.

4

1996, the district court announced that it would not order Betts's instatement into the 1996-1997 School of Medicine class. Following a period of discovery, the parties filed cross-motions for summary judgment. On May 27, 1997, the district court, after receiving briefing on the motions, granted the University's motion and denied Betts's cross-motion. In ruling on Betts's ADA and Rehabilitation Act claims, the district court found that Betts was not a "qualified individual with a disability" because he was not able to meet the academic standards required for admission to the School of Medicine. In ruling on his Procedural and Substantive Due Process claims, the district court specifically found that the University's decision was neither arbitrary nor capricious. Finally, in rejecting Betts's breach of contract claim, the district court held that the alleged contract between the parties gave the University the sole discretion to determine whether Betts was prepared for the School of Medicine. This appeal followed.

II.

On appeal, Betts argues that the district court erred in granting the University summary judgment on each of his claims. We review de novo the district court's decision to grant the University summary judgment. See Halperin v. Abacus Tech. Corp., 128 F.3d 191, 196 (4th Cir. 1997). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

III.

Betts first challenges the district court's decision to grant the University summary judgment on his ADA claim.[3] Absent direct evi-

_____

[3] Because Congress has directed that Title II of the ADA be interpreted in a manner consistent with § 504 of the Rehabilitation Act, see 42 U.S.C.A. §§ 12134(b), 12201(a) (West 1995), we combine the analysis of Betts's ADA and Rehabilitation Act claims, see Shafer v. Preston Mem'l Hosp., 107 F.3d 274, 276 n.3 (4th Cir. 1997); Doe v. University of Md. Med. Sys. Corp., 50 F.3d 1261, 1264 n.9 (4th Cir. 1995); Tyndall v. National Educ. Ctrs., Inc., 31 F.3d 209, 213 n.1 (4th Cir. 1994).

5

dence of discrimination, Betts must satisfy the three-step proof scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to prevail on his ADA claim. First, Betts must establish, by a preponderance of the evidence, a prima facie case of discrimination. See id. at 802. Once established, the burden shifts to the University to "rebut the presumption of discrimination by producing evidence that the plaintiff was [denied participation in a program] . . . for a legitimate, nondiscriminatory reason." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). If the University meets its burden of production, the presumption raised by the prima facie case is rebutted and "drops from the case," id. at 255 n.10, and Betts bears the ultimate burden of proving that he has been the victim of intentional discrimination, see St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993).

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual." 42 U.S.C.A. § 12112(a) (West 1995). Therefore, to establish a prima facie case under the ADA, Betts must prove (1) that he has a disability; (2) that he is an otherwise qualified individual; and (3) that he was denied a benefit solely because of his disability. See Doe v. University of Maryland Med. Sys. Corp., 50 F.3d 1261, 1264-65 (4th Cir. 1995); see also Martinson v. Kinney Shoe Corp., 104 F.3d 683, 686 (4th Cir. 1997); Williams v. Channel Master Satellite Sys. Inc., 101 F.3d 346, 348 (4th Cir. 1996), cert. denied, 117 S. Ct. 1844 (1997).

In ruling on Betts's ADA claim, the district court assumed, without deciding, that Betts was disabled. Nevertheless, the district court found that Betts was not a "qualified individual with a disability" because he was not able to meet the academic standards required for admission to the School of Medicine. In particular, the district court noted Betts's failure to maintain a GPA of 2.75 for the academic year. Betts contends that the district court erred in finding that he was not "otherwise qualified" to attend the School of Medicine because he attained a GPA of 3.5 when his disability was reasonably accommodated.

Under the ADA,

6

The term "qualified individual with a disability" means an individual with a disability who, <u>with or without reasonable modifications</u> to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C.A. § 12131(2) (West 1995) (emphasis added). In other words, an individual is "otherwise qualified" only if he is "able to meet all of a program's requirements in spite of his handicap." <u>Southeastern Community College v. Davis</u>, 442 U.S. 397, 406 (1979). A court is obligated, however, to consider the effect that any reasonable accommodation may have on an individual's ability to meet all of a program's requirements. <u>See Alexander v. Choate</u>, 469 U.S. 287, 301 (1985). Betts bears the burden of demonstrating that he is otherwise qualified. <u>See Tyndall v. National Educ. Ctrs.</u>, 31 F.3d 209, 213 (4th Cir. 1994).

Here, the essential eligibility requirements for admission to the School of Medicine through participation in the MAAP program were maintaining a minimum GPA of 2.75 per semester and receiving no grade lower than a C. It is undisputed that during the fall semester Betts did not have a minimum GPA of 2.75 and had one grade below a C. During the spring semester, however, the University decided that Betts should be allowed double time on his exams. On these exams, Betts attained a GPA of 3.5 and received no grade below a B.

As noted above, in considering whether an individual is able to meet the essential requirements for participation in a given program, a court must also consider the effect that any reasonable accommodation may have on that individual's ability to meet all of a program's requirements. Here, Betts contends, and the University adamantly agrees, that allowing him double time on his exams was a reasonable accommodation. Whatever doubts we may have concerning the reasonableness of the accommodation in this case, which we do not decide here, it is clear that when given double time on his exams, Betts more than satisfies the essential eligibility requirements for admission to the School of Medicine through participation in the MAAP program. Because Betts is able, with accommodation, to meet

7

those essential requirements, he is a "qualified" individual for purposes of the ADA. See Davis, 442 U.S. at 406.

Our holding today -- that Betts is otherwise qualified because he is able to meet the essential eligibility requirements for admission to the School of Medicine -- is limited to the narrow facts of this case. Ordinarily, the determination to admit a student into a given academic program requires the expert evaluation of numerous factors that are not conducive to judicial decisionmaking. See, e.g., Board of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 92 (1978) (noting that "Courts are particularly ill-equipped to evaluate academic performance"). Here, however, Betts was guaranteed admission into the School of Medicine if he maintained a minimum GPA of 2.75 and received no grade lower than a C in the MAAP program. These specific (and readily ascertainable) requirements, coupled with the University's concession that allowing Betts double time on his exams was a reasonable accommodation, present this Court with an academic decision amenable to judicial review. In the end, therefore, our holding that Betts is able to meet the essential eligibility requirements for admission to the School of Medicine turns on the unique facts of this case: Betts's participation in the now defunct MAAP program and the University's concession that allowing Betts double time on his exams was a reasonable accommodation.

Although we conclude that the district court erred in finding that Betts was not otherwise qualified, we note that Betts has not yet established a prima facie case of discrimination under the ADA. In ruling on the University's motion for summary judgment, the district court assumed, without deciding, that Betts was disabled. To avoid summary judgment, therefore, Betts must also demonstrate that he is, in fact, disabled. See Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

As an initial matter, we note that an individual diagnosed with a "learning disability" is not necessarily "disabled" for purposes of the ADA. According to the ADA:

8

The term "disability" means, with respect to an individual--

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C.A. § 12102(2) (West 1995). To qualify as having a disability under subsection (A), Betts must first establish that he has a "physical or mental impairment." According to Dr. Robert Muller, although Betts's I.Q. is in the superior range, difficulties with his short-term memory and his reading speed prevent him from performing in the superior range. In short, there is a medically diagnosed discrepancy between Betts's intellectual capabilities and his performance.

Although the term "impairment" is not defined in the ADA, Webster's defines the term as a "decrease in strength, value, amount, or quality." Webster's II New Riverside University Dictionary 612 (1988); see also Webster's Third New International Dictionary 1131 (1986) (defining impairment as "deterioration" or "lessening"). Under this definition, we have little difficulty concluding that Betts's inability to perform up to his intellectual capabilities constitutes a mental impairment. See Price v. National Bd. of Med. Examiners, 966 F. Supp. 419, 424 (S.D. W. Va. 1997) (assuming that a reading disorder is a mental impairment for purposes of the ADA). Indeed, many specific "learning disabilities," are impairments, rather than actual disabilities, under the ADA. See, e.g., 28 C.F.R. § 35.104 (1998) (defining mental impairment to include "specific learning disabilities").

Next, Betts must establish that his learning disorder substantially limits one or more of his major life activities. See 42 U.S.C.A. § 12102(2)(A). Although Betts may very well have a learning disorder that "substantially limits" his ability to attend medical school,

9

attending medical school is not a "major life activity." <u>See</u> <u>Runnebaum v. Nationsbank</u>, 123 F.3d 156, 170 (4th Cir. 1997) (en banc) (providing "that an activity qualifies under the statutory definition as one of the major life activities contemplated by the ADA if it is relatively more significant or important than other life activities"), <u>overruled on other grounds by Bragdon v. Abbott</u>, 118 S. Ct. 2196 (1998). Learning, in contrast, is considered one of the major life activities. <u>See, e.g.</u>, 29 C.F.R. § 1630.2(i) (listing "major life activities" as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, <u>learning</u>, and working" (emphasis added)). Thus, whether Betts is disabled turns on whether his learning disorder "substantially limits" his ability to learn.

The ADA does not define the term "substantially limits." When Congress does not expressly define a statutory term or phrase, a court should "normally construe it in accord with its ordinary or natural meaning." <u>Smith v. United States</u>, 508 U.S. 223, 228 (1993). We have previously noted that the ordinary or natural meaning of "substantially limits" requires that the impairment significantly restrict the individual's ability to perform a major life activity. <u>See Runnebaum</u>, 123 F.3d at 167 (stating that "the impairment must be significant, not merely trivial"); <u>Forrisi v. Bowen</u>, 794 F.2d 931, 933-34 (4th Cir. 1986) (concluding that "[t]he statutory language, requiring a substantial limitation of a major life activity, emphasizes that the impairment must be a significant one"). The EEOC, pursuant to its charge to issue regulations to carry out Title I of the ADA, <u>see</u> 42 U.S.C.A. § 12116 (West 1995), has similarly defined the term. According to the EEOC, "substantially limits" means:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or

> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1) (1998).

10

When the major life activity at issue is learning, therefore, an individual is not disabled unless his ability to learn is significantly restricted. An individual's ability to learn is significantly restricted if it is limited in comparison to most people. See Price, 966 F. Supp. at 422 (concluding that the plaintiffs were not disabled because they were "able to learn as well as or better than the average person in the general population"). Thus, for Betts to establish that he is disabled for purposes of the ADA, he must show that his learning disorder restricts his ability to learn in comparison to the general population. To explain this standard, the district court in Price gave the following useful hypothetical:

> Student A has average intellectual capability and an impairment (dyslexia) that limits his ability to learn so that he can only learn as well as ten percent of the population. His ability to learn is substantially impaired because it is limited in comparison to most people. Therefore, Student A has a disability for purposes of the ADA. By contrast, Student B has superior intellectual capability, but her impairment (dyslexia) limits her ability so that she can learn as well as the average person. Her dyslexia qualifies as an impairment. However, Student B's impairment does not substantially limit the major life function of learning, because it does not restrict her ability to learn as compared with most people. Therefore, Student B is not a person with a disability for purposes of the ADA.

Id. at 427.

It is clear that Betts has a history of scholastic achievement. For example, in 1994, Betts was awarded Bachelor of Science degrees in both Biology and Chemistry from North Carolina Wesleyan College. Moreover, Betts's I.Q. places him in the 96th percentile. Indeed, although Betts has some learning difficulty, the LNEC concluded that Betts had average intellectual ability. As such, it appears that Betts's learning disorder, i.e., his impairment, does not restrict his ability to learn as compared with most people. Nevertheless, because the district court assumed, without deciding, that Betts was disabled, the record is not sufficiently developed for us to determine whether Betts is best compared to Student A or Student B in the aforementioned

11

hypothetical. As a result, we remand for the district court to determine, in the first instance, whether Betts is disabled for purposes of the ADA.**4**

IV.

Next, Betts argues that the University rescinded his offer of admission to the School of Medicine without providing any prior notice or an opportunity to be heard. As a result, Betts contends that the University violated his right to procedural due process. Although Betts was not present when the MAAP Promotions Committee decided to rescind his offer of admission to the School of Medicine, "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." Board of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 102 (1978) (Marshall, J., concurring in part and dissenting in part) (citing Cafeteria Workers v. McElroy, 367 U.S. 886, 895 (1961)). We agree with the district court that the requirements of due process were satisfied and that Betts's due process attack on the validity of the University's procedures must fail.

On May 28, 1996, the MAAP Promotions Committee met and decided that Betts had failed to meet the overall GPA standard of 2.75 for the academic year and his offer of admission was rescinded. Assuming, without deciding, that Betts had a protectable liberty or property interest in the aforementioned meeting, see Henson v. Honor Comm. of Univ. Va., 719 F.2d 69, 73 (4th Cir. 1983) (assuming the existence of a liberty or property interest in a proceeding adjudicating

_____

**4** During oral argument, counsel for Betts argued that the University conceded Betts's disability in district court. In contrast, counsel for the University argued that its statements before the district court had more to do with summary judgment strategy than with an express concession of a necessary element on which Betts bore the burden of proving. Based on the record before us, we believe it best to allow the district court to decide whether the University has conceded that Betts's learning disorder constitutes a disability. Likewise, although we analyzed whether Betts is disabled under 42 U.S.C.A. § 12102(2)(A), Betts may, on remand, argue that he is disabled based upon the definitions contained in either 42 U.S.C.A. § 12102(2)(B) or 42 U.S.C.A. § 12102(2)(C).

12

alleged honor code violations), we conclude that the procedural protections afforded him were sufficient under the Due Process Clause of the Fourteenth Amendment. Where, as here, the challenged action involves a subjective inquiry, the standard for evaluating whether there has been a denial of procedural due process is substantially relaxed. See Siu v. Johnson, 748 F.2d 238, 244-45 (4th Cir. 1984). In such a case, an individual has received due process if the decision was not arbitrary and capricious. See id. at 245. A decision is arbitrary and capricious if, in the end, it did not "involve the exercise of professional judgment." Id.

Here, the MAAP Promotions Committee used its professional judgment to set the GPA standard that Betts was required to attain for admission to the School of Medicine. After reviewing the record in this case, it is clear to us that the decision to rescind Betts's offer of admission to the School of Medicine was based on the MAAP Promotions Committee's application of that standard. Indeed, the Supreme Court's reasoning in Horowitz, 435 U.S. at 78, compels our conclusion that Betts's procedural due process rights were not violated. In Horowitz, a medical student was denied permission to graduate after several tiers of evaluators concluded that the student did not possess the requisite skills to perform surgery. See id. at 82. Although the student was never given a formal hearing to rebut the charges of incompetence, the Supreme Court nonetheless found no violation of due process. See id. at 85. "A school," the Supreme Court noted, "is an academic institution, not a courtroom or administrative hearing room." Id. at 88. As a result, the Court held that a school, when making an academic judgment, need not provide a student with all of the procedural requirements that a court or an administrative agency must provide a party.**5** See id. at 89-90.

_____

**5** We disagree with Betts's contention that his offer of admission to the School of Medicine was rescinded without any notice or an opportunity to be heard. First, under the terms of Betts's probation, a decision on whether he would be allowed to enter the School of Medicine was to be made by the MAAP Promotions Committee upon its review of his spring semester grades. Thus, while Betts may not have known that the MAAP Promotions Committee was meeting on May 28, 1996, he was on notice that such a meeting would be held. Second, although Betts was not present at the May 28, 1996, meeting, he received the opportunity to appeal the MAAP Promotions Committee's decision to Robert M. Carey, the Dean of the School of Medicine. In fact, Betts received a hearing, with his counsel present, before Dean Carey, Beth Bailey, the Admissions Director, and Dr. Benjamin Surgill, the Associate Dean for Admissions.

13

V.

Betts also contends that the University dismissed him from the MAAP program without ever knowing that he attained a GPA of 3.5 when allowed double time on his exams. As a result, Betts argues that the University's decision to rescind his offer of admission to the School of Medicine was arbitrary and capricious and, therefore, violated his right to substantive due process. Again, we disagree.

In Regents of Univ. of Mich. v. Ewing, 474 U.S. 214 (1985), the Supreme Court held that substantive due process concerns are raised only by a decision that is "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." Id. at 225. Absent such a departure, a court may not override an academic decision. See id. As we stated in connection with Betts's procedural due process claim, it is clear that the decision to rescind Betts's offer of admission to the School of Medicine was based on the professional judgment of the MAAP Promotions Committee that Betts was not prepared for medical school. Thus, we may not override that decision.

VI.

Finally, Betts makes a state law breach of contract claim. Betts contends that the University's offer to participate in the MAAP program, coupled with his acceptance, created a binding contract between the parties. Although Betts concedes that he failed to maintain at least a 2.75 GPA during the fall semester (and, therefore, that the University would have been justified in rescinding the contract at that time), he argues that by permitting him to continue in the MAAP program for the spring semester, the University waived its requirement that he attain a 2.75 GPA during the fall semester. Because he attained a GPA of 2.84 during the spring semester, Betts argues that he satisfied the terms of the contract and, more importantly, that the University violated the parties' contract by dismissing him from the MAAP program.

Even assuming that the University waived its requirement that Betts attain a 2.75 GPA during the fall semester, the University did not breach its alleged contract with Betts when it denied him admis-

14

sion to the School of Medicine. Although the University permitted Betts to take classes during the spring semester, it did so on the express condition that it now retained the discretion to decide, based on Betts's spring semester grades, whether Betts was prepared for the School of Medicine. See Stanley's Cafeteria, Inc. v. Abramson, 306 S.E.2d 870, 873 (Va. 1983) (noting well-established rule that parties may modify the terms of a contract). After reviewing Betts's spring semester grades, the MAAP Promotions Committee concluded that Betts failed to meet the overall GPA standard of 2.75 for the academic year. Accordingly, the University did not breach the alleged contract by denying Betts admission to the School of Medicine. See Averett v. Lipscombe, 76 Va. 404 (1882) (making purchaser's good-faith satisfaction with the title a condition precedent to performance under the contract was acceptable); Watts v. Holland, 11 S.E. 1015, 1016 (Va. 1890) (same); see also Kohler v. Leslie Hindman, Inc., 80 F.3d 1181 (7th Cir. 1996) (holding that a consignment agreement allowing an auction house to rescind the sale of painting in its "sole discretion" was analogous to a satisfaction agreement).

VII.

For the foregoing reasons, the decision of the district court is affirmed in part and reversed in part.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

ERVIN, Circuit Judge, concurring in the judgment:

I vote to remand this case because the district court did not fully consider whether Betts has demonstrated that with reasonable accommodations, he is a "qualified" individual for the purposes of the ADA.

As a general rule, I acknowledge the wisdom of judicial deference to the admissions decisions of academic institutions, so long as the institution in question demonstrates an actual attempt at reasonable accomodation. See Wynne v. Tufts Univ. Sch. of Med., 932 F.2d 19, 25 (1st Cir. 1991). Yet in the instant case, I am troubled that the University offered Betts an accommodation in the form of double time on examinations, but then made its admissions decision largely on the

15

basis of Betts' prior poor performance under standard testing conditions.

Upon further review, the district court may well conclude that the University did not act arbitrarily or capriciously when it denied Mr. Betts admission to the medical school. Notwithstanding this possibility, the district court must explain why Betts, who met the grade point average criterion of the MAAP on all of his double-time examinations, was not a qualified individual under the ADA. In this regard I note with interest the majority's conclusion that when given the double-time accommodation, "Betts more than satisfies the essential eligibility requirements for admission." Because Mr. Betts' status as a "qualified" person was the only issue contested below, if the majority is correct Betts' complaint should survive a motion for summary judgment.

I strongly disagree with the majority's decision to remand this case for further consideration of whether Mr. Betts is "disabled" under the ADA. See 42 U.S.C.A. § 12102(2) (West 1995). Although disability is a required element of the prima facie case in an ADA claim, the University has plainly conceded this issue.

The district court proceeded on this very assumption, noting that "[t]he parties agree that the [disability and denial of benefits] criteria are satisfied." Betts v. The Rectors and Visitors of the Univ. of Va., No. 96-0054-C (W.D. Va. May 27, 1997) (unpublished memorandum opinion). At no point during the proceedings below did the University contest the issue of disability. The University then waived the issue on appeal, stating unequivocally in its brief, "the University does not contest Betts' allegation that he has a learning disability that meets the definition of `disability' under the ADA . . . ."

Given the University's posture on appeal, the issue of disability is waived and this Court may not consider it further. Whatever doubts we might have about the wisdom of the University's legal strategy, we may not step into the shoes of either party and re-litigate the case in a manner more to our own liking. Our role is limited to consideration of the issues properly before us.

16